Sandra HAMPTON, Parent and Next
Friend of Ollie Hampton, et al.
Plaintiffs

v.

JEFFERSON COUNTY BOARD OF
EDUCATION, et al. Defendants

No. CIV.A.3:98–CV–262–H.

United States District Court,
W.D. Kentucky,
at Louisville.

June 20, 2000.

Teddy B. Gordon, Louisville, KY, for Plaintiffs.

Byron E. Leet, Francis J. Mellen, Jr., Cynthia Blevins Doll, Wyatt, Tarrant & Combs, Louisville, KY, for Defendant.

[Kentucky Alliance Against Racist & Political Repression; Parents Involved in Education], Aubrey Williams, Louisville, KY, [Virgil C. Fitzpatrick, Parent, et al.; Kentucky Fair Housing Council, Inc.; Kentucky Council on Human Relations, Inc.; Quality Education for All Students, Inc.], Stephen T. Porter, Louisville, KY, Cecil A. Blye, Sr., Louisville, KY, Galen A. Martin, Kevin J. Kijewski, Kentucky Fair Housing Council, Inc., Louisville, KY, William N. Haliday, Louisville, KY, [American Civil Liberties Union of Kentucky, Inc.], Sheryl G. Snyder, Amy D. Cubbage, Brown, Todd & Heyburn, Louisville, KY, David A. Friedman, Fernandez, Friedman, Grossman & Kohn, Louisville, KY, for Intervenor Plaintiffs.

Sunil H. Mansukhani, Michael S. Maurer, U.S. Department of Justice, Civil Rights Division, Washington, DC, for Amicus.

## MEMORANDUM OPINION

HEYBURN, District Judge.

Twenty-five years ago, United States District Judge James F. Gordon entered a decree designed to remedy discriminatory practices in our public schools. That action formed a lasting impression upon this community, reshaping our school system and our view of the federal courts. In the intervening years, the Jefferson County Public Schools[1] succeeded admirably in meeting the original objectives of the 1975 desegregation decree (the "Decree"). Recently, this Court had occasion to revisit that case and its background. *See Hampton v. Jefferson County Bd. of Educ.*, 72 F.Supp.2d 753, 755–770 (W.D.Ky.1999) (*"Hampton I"*). In that opinion, this Court held that the Decree continued to govern the Board's actions. Plaintiffs now move to dissolve the Decree.

The motion's posture is truly exceptional: Usually, it is the school board trying to shed its obligations under a desegregation order. So far as the Court can discern, only once before have private litigants sought to remove a desegregation decree against the will of a school board. *See Capacchione v. Charlotte–Mecklenburg Schs.*, 57 F.Supp.2d 228 (W.D.N.C.1999). Never before have the plaintiffs been African-Americans, for whose supposed benefit such decrees were entered. This case manifests our many competing visions about educating our children, as well as the confusion and frustration attending our nation's long project of remedying the effects of racial segregation.

A legal problem so closely interwoven with social and moral threads seems to defy an absolute solution. For that reason, one approaching these issues must do so with humility and determination. With the history of Jefferson County's struggle to integrate its schools fresh in mind, the Court now undertakes that challenge.

### I.

### SUMMARY

In this Memorandum Opinion, the Court sets limits on the duties and powers of JCPS under the Equal Protection Clause.

---

1. The Defendants include the Jefferson County Board of Education, the individual Board members, and the Superintendent. This Memorandum will refer to them collectively as "JCPS" or the "Board."

The Court does not decide what educational policies might be best for our schools. The Board retains broad power to make those decisions. The Court's role is to set out the constitutional parameters of that power.

First, the Court concludes that Judge Gordon's original Decree, as continued by Judge Ballantine, should be dissolved. This is appropriate because the Board has demonstrated extraordinary good faith and has accomplished all the purposes of the Decree. To the greatest extent practicable, the Decree has eliminated the vestiges associated with the former policy of segregation and its pernicious effects.

Next, the Court concludes that the Board's use of racial quotas in the Central High Magnet Career Academy would violate the Equal Protection Clause. The Board must admit to Central any students who applied for this coming school year and were denied enrollment due to race. The Board must do this for the 2000–2001 school year.

The same rule against hard racial quotas may apply to other magnet schools. The Board may need to redesign its admission procedures for its other magnet schools and programs to comply with the Equal Protection Clause as explained in this Memorandum Opinion. The Court is mindful of the need for a transition period to allow a stable change of admissions criteria, if one is necessary. The Court will only make such a requirement after a further hearing and will not require any change until the 2002–2003 school year.

Plaintiffs raise no other issues as to current student assignment. Since the Board may have compelling reasons to continue a fully integrated school system in all other schools, the Court will not require other changes in the current student assignment plan. The Board is free to adopt whatever student assignment plan it deems most beneficial to its students, so long as it is consistent with this Memoran-dum Opinion and the Equal Protection Clause.

This Opinion recognizes the democratically-elected school board's power to use race in limited, constitutional ways to maintain its desegregated school system; it recognizes the Board's freedom to implement any other non-discriminatory student assignment plan. Thus, the Court has set out a broad spectrum of constitutionally permissible conduct.

## II.

### THE STANDARD FOR DISSOLUTION

Any consideration of school desegregation orders begins with the Fourteenth Amendment to the Constitution: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Upon this text the Supreme Court based its decisions that "[s]eparate educational facilities are inherently unequal,"[2] and that federal courts should employ their equitable powers "to eliminate from the public schools all vestiges of state-imposed segregation." *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *see Brown v. Board of Educ. of Topeka*, 349 U.S. 294, 299–301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). School boards have an "affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County Sch. Bd. Of New Kent County, Va.*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). The continuing Decree is one of those equitable remedies.

The early desegregation opinions necessarily focused on the recent and willful resistance of school boards to remedial measures, so they naturally failed to consider how and under what circumstances the decrees would one day end. Without conclusive guidance, lower courts adopted

---

**2.** *Brown v. Board of Educ. of Topeka*, 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

various standards of unitariness, provisional unitariness, and vestige elimination. Not until *Board of Education of Oklahoma City Public Schools v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), did the Supreme Court attempt to define the standard for dissolving a decree. "The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." *Id.* at 249–50, 111 S.Ct. 630; *see also Freeman v. Pitts,* 503 U.S. 467, 491, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992).

These holdings establish two criteria— one subjective, one objective—both of which must be met to dissolve a decree in its entirety. Both are of equal importance, and together they highlight the two overlapping goals of *Swann.* The first requirement—good faith compliance with the decree—focuses on behavior and process. Though School boards change with the political choices of their constituents, the Constitution requires devotion to nondiscriminatory policies regardless. As proof of their reformation, the Board must "demonstrate[ ], to the public and the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance." *Freeman,* 503 U.S. at 491, 112 S.Ct. 1430. Good faith is best measured by board attitudes, decisions, and declarations of policy. *See Brown v. Board of Educ. of Topeka,* 978 F.2d 585, 588 (10th Cir.1992). After considering the larger picture of Board behavior, the Court must be convinced that the Board has dedicated itself totally to de-

segregated schools. The parties seeking dissolution—here the Plaintiffs—bear the burden of proving compliance and good faith. *See Agostini v. Felton,* 521 U.S. 203, 214–15, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 383, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).

The second requirement—elimination of the vestiges of de jure segregation to the extent practicable—focuses on outcome or result. A vestige of de jure segregation is a current or latent racial imbalance that is "traceable, in a proximate way, to the prior violation" of the Fourteenth Amendment. *Freeman,* 503 U.S. at 494, 112 S.Ct. 1430; *see Missouri v. Jenkins,* 515 U.S. 70, 88– 89, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (*"Jenkins III"*). Imbalances may be assessed in any of the six so-called *Green* factors—student assignment, faculty assignment, staff assignment, transportation, extra-curricular activities, and physical facilities, *see Green,* 391 U.S. at 435, 88 S.Ct. 1689, plus any other factors that the Court, in its equitable discretion, chooses to evaluate. *See Freeman,* 503 U.S. at 493, 112 S.Ct. 1430. Because a desegregation decree is ultimately just a remedy for the Board's prior unconstitutional conduct, traceability—the presence or absence of a causal connection to the original dual systems—is as crucial an element as the imbalance itself. "The vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the *de jure* violation being remedied." *Id.* at 496, 112 S.Ct. 1430. In other words, federal courts should hold school boards accountable for their own bad conduct and its consequences, but not for all society's other racial, economic, and educational ills.[3]

---

**3.** One cannot overemphasize the importance of causation in this tangled field of the law. *See, e.g., id.* at 501–07, 74 S.Ct. 686 (Scalia, J., concurring). Equitable orders may only redress harm caused by the prior unconstitutional acts of a school board. When equity oversteps this bound, it imposes obligations

not legitimately characterized as remedial. Therefore, assigning the burdens of proof is a much more complicated task for this second criterion. Obviously, the parties seeking to retain the Decree have the burden of *pleading* the existence of current racial imbalances. But if imbalances are shown, who has the

These should be left for elected representatives to resolve.

## III.

### THE TESTIMONY AND EVIDENCE

The original parties and Intervenors [4] presented eight full days of evidence on the Plaintiffs' motion for dissolution. They took vastly different approaches to the proof. At times, it seemed as if there were several cases within the case. Plaintiffs relied exclusively on the stipulated fact that all JCPS schools have complied with the African–American student assignment guidelines since 1975; the testimony and evidence from the first hearing about a year ago; and their only witness, Dr. John Whiting, a former teacher and administrator for JCPS. After Dr. Whiting's testimony, Plaintiffs rested.

The Board called Carol Haddad, Chairperson of the Board; Dr. Stephen Daeschner, Superintendent of JCPS; Dr. Robert Rodosky, Executive Director of the Department of Accountability, Research, and Planning at JCPS; and Patricia Todd, a former teacher and the current Executive Director for the Department of Student Assignment, Health, and Safety at JCPS. They testified thoroughly regarding JCPS's compliance with the Decree and its efforts at desegregation, as well as the multiple potential student assignment contingencies in the Decree's absence. JCPS once again produced Dr. Gary Orfield, a professor of education and social policy and director of the Civil Rights Project, who testified about the causes of racial imbalances in schools and the nationwide efforts to curb them. The Board introduced documentary evidence of Jefferson County's racial demography and a detailed analysis of various student assignment scenarios. JCPS provided, directly and through the Intervenors, an impressive volume of information about its operations.

The Intervenors introduced most of their substantial documentary evidence through cross-examination of Dr. Rodosky and Ms. Todd, including written JCPS policies and statistics showing racial percentages for various programs, classes, employments, and other objective indicia of performance and participation in the school system. They also called Debra Stallworth, Frances Thomas, Carmen Weathers, and Dr. Robert Douglas to testify regarding their perceptions of racism and inequity in student assignment. Harold Fenderson, principal of Central High Magnet Career Academy, testified about Central's efforts to stay within the racial

burden of *persuasion* as to causation? The answer depends on the type of imbalance at issue.

As to the six *Green* factors, "once there has been a finding that a defendant established an unlawful dual school system in the past, there is a presumption that current disparities are the result of the defendant's unconstitutional conduct." *Jenkins v. Missouri,* 122 F.3d 588, 593 (8th Cir.1997) (*citing Freeman,* 503 U.S. at 494, 112 S.Ct. 1430; *Dayton Bd. of Educ. v. Brinkman,* 443 U.S. 526, 537–38, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979); *Keyes v. School Dist. No. 1,* 413 U.S. 189, 208–09, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973)). A plaintiff must overcome this presumption by proving otherwise. The six *Green* factors—and most particularly student assignment—are so synonymous with the core purposes of public education that the Court must assume that imbalances are the result of the old dual systems.

But as the Eighth Circuit also held in *Jenkins,* "the presumption of causation will only be applied to [non-*Green*-factor] disparities if the court has already specifically found that ... the district has suffered [the imbalances] as a result of the dual system." *Jenkins,* 122 F.3d at 594; *see also United States v. City of Yonkers,* 197 F.3d 41, 49–50 (2d Cir.1999) (*citing* 181 F.3d 301, 309–11 (2d Cir.1999)); *Coalition to Save Our Children v. State Bd. of Educ. of the State of Delaware,* 90 F.3d 752, 776–77 (3d Cir.1996).

4. The following parties intervened in the lawsuit: the American Civil Liberties Union, the Fair Housing Council, the Kentucky Alliance Against Racist and Political Repression, Parents Involved in Education, Quality Education for All Students, Inc., the Kentucky Council on Human Relations, Inc., and several JCPS students and their next friends. The Court will refer to them jointly as the "Intervenors."

guidelines, as well as the administration's and faculty's attitudes toward student excellence irrespective of race.

Dr. J. Blaine Hudson, professor of education history and social psychology, provided an impressive review of social science articles on race and education. Particularly, he discussed the scholarly attempts to explain the nation's racial achievement gap, and the lingering historical effects of racial segregation in schools. Beverley Moore, former school teacher and current member of the Board, reviewed the Board's recent efforts to promote more integration and achievement parity in the school system. Dr. Steve Ryan, a professor of secondary education and researcher in ability tracking, discussed JCPS's different educational programs and their disparate racial effects. Daniel Clemons, Rhonda Mathies, and Thomas Moffett also testified about their personal observations and opinions of the school system.

After presenting their witnesses and documentary evidence, each party moved for judgment in its favor, creating a somewhat triangular argument. Plaintiffs simply contend that the Decree has outlasted its utility and must be dissolved. Defendants concede compliance and good faith, but argue that Plaintiffs failed to show that a latent demographic imbalance is not a result of the old dual system, and therefore the demographic vestige prevents dissolution. The Intervenors join the Defendants in this demographic argument, but also submit that other racial imbalances in the school system refute compliance, belie good faith, and constitute remediable vestiges of the de jure violation.

5. The Court will presume causation when the imbalance is one of the six *Green* factors or a practice found specifically discriminatory by the original Decree. *See supra* note 2. Otherwise, the Intervenors must prove causation. The reason for this is that school boards are entitled to a clear statement of their obligations under a desegregation decree, and their compliance and progress cannot be measured by indices never addressed by the

## IV.

## THE ABSENCE OF CURRENT VESTIGES

The Intervenors have asserted a number of current vestiges of de jure public school discrimination: general societal discrimination or racism, classroom segregation, unequal educational outcomes attributed to teacher attitudes, disparate treatment of minorities in the Advance Program, and teacher/administrator assignments. The Intervenors argue that each of these conditions is (1) a requirement of the Decree and must be remedied before it can be dissolved; (2) a vestige of discrimination from twenty-five years ago; and (3) evidence of the Board's bad faith. Their attack ranges across all facets of Board policy and common assumptions about its good faith compliance with the Decree.

■ To be a vestige of prior discrimination, a current racial imbalance must be caused by the old dual systems.[5] Most of the Intervenors' complaints suffer as a constitutional matter from an absence of causation. As to some of the imbalances (classroom segregation, student achievement), no court has ever required a school system to eliminate them before dissolving a decree. As to others (teacher and administrator assignment), there is no evidence that an imbalance even exists. Finally, the Intervenors introduced no evidence of actual, tangible racial discrimination within the school system, and none of their evidence impugns the Board's continuing good faith in discharging its obligations under the Decree.[6]

Though the Intervenors raised many thought-provoking educational issues, none is of constitutional significance.

Court. *See Pasadena City Bd. of Educ. v. Spangler,* 427 U.S. 424, 438–40, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976); *Jenkins III,* 515 U.S. at 101, 115 S.Ct. 2038; *Dowell,* 498 U.S. at 246, 111 S.Ct. 630.

6. The Court considers the Board's good faith more fully in Section V below.

### A.

■ The Intervenors contend that discrimination within society generally and "institutional racism" within JCPS in particular are good reasons to keep the Decree in place. Yet for reasons that should make common sense, such vague allegations cannot prevent the dissolution of a desegregation decree.

First, the original Decree was intended to remedy governmentally sanctioned discrimination, not individual biases. Of course, many may have hoped that federal court intervention in our schools would have positive consequences for race relations and might remedy individual biases. The Court believes that the Decree has had such a positive impact. Yet however deplorable one might consider the consequences of general societal prejudice, the Court cannot rewrite the historical and legal basis of this Decree to address them.

Second, federal courts have never accepted such general allegations to support a decree. In this case, the only evidence of "institutional racism" as an abstract notion was anecdotal. To some people, these subtle social pathologies are very real. However, only specific racial imbalances and other sanctioned acts of discrimination can be targeted for remedy.[7]

To be sure, the Board and the Intervenors may have vociferous, legitimate disagreements about educational policy. These policy disagreements are just that,

and do not amount to constitutional violations.

### B.

■ The Intervenors have introduced data showing that 53.1% of high school classes and 33.6% of middle school classes are outside the Board's 15%–50% guidelines applicable to schools generally. *See* Orig. Intervening Plaintiffs' Ex. 2, tab R.[8] These data, the Intervenors argue, reveal an existing vestige of de jure segregation.

No federal court—let alone Judge Gordon in this case—has ever required specific levels of integration at the classroom level. *See Milliken v. Bradley,* 418 U.S. 717, 740–41, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *Coalition to Save Our Children,* 90 F.3d at 762. In fact, the Sixth Circuit has explicitly rejected the proposition that "equal protection requires desegregation within the school in the same way that it requires desegregation among schools." *Oliver v. Kalamazoo Bd. of Educ.,* 640 F.2d 782, 809 (6th Cir.1980). Generally, courts have recognized the futility and difficulty of a classroom quota because student choice is such an important part of classroom assignment. The Court finds the same to be true in Jefferson County.

Furthermore, the Court disagrees with the Intervenors' assertion that classroom integration was a part of the Decree. Judge Gordon did not mention classroom integration in the 1975 Decree itself.[9] Nor

---

7. "Because racial characteristics so seldom provide a relevant basis for disparate treatment, and because classifications based on race are potentially so harmful to the entire body politic, it is especially important that the reasons for any such classification be clearly identified and unquestionably legitimate." *Fullilove v. Klutznick,* 448 U.S. 448, 533–35, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (Stevens, J., dissenting) (footnotes omitted). Borrowing directly from the compelling interest analysis, one of the few compelling interests considered and disposed of by the Supreme Court is that of general societal discrimination. *See, e.g., Shaw v. Hunt,* 517 U.S. 899, 909–10, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996); *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 274–75, 276, 288, 106 S.Ct. 1842,

90 L.Ed.2d 260 (1986). According to those cases, it would not be enough for JCPS and the Intervenors to note that we live in a somewhat race-conscious, if not racist, society. Rather, the school board "must identify that discrimination, public or private, with some specificity before they may use race-conscious relief." *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 504, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).

8. Elementary school data are not available.

9. Judge Gordon did require the superintendent of JCPS to report to the Court's Special Master the "Number of students by race enrolled in each classroom of the schools of the

did the Sixth Circuit ever suggest that classroom segregation was an original constitutional inequity. Judge Gordon did want to monitor classroom composition to ensure that the Board was not undermining the Decree, but considered the issue at some length, and never found evidence of such a violation. *See Haycraft v. Board of Educ. of Jefferson County, Ky.*, Nos. 7045 & 7291, at 12–16 (W.D. Ky. June 15, 1978) ("*Haycraft 1978*"). Nor is there any evidence that the Board is attempting now to undermine the Decree by assigning students to certain classes on the basis of race.[10]

For these reasons, this Court should not retroactively impose new duties on JCPS.[11]

## C.

■ The Intervenors argue that twenty-five years under the Decree have produced little measurable academic progress for African–American students relative to their white counterparts. Though an achievement gap still exists, in fact, African–American students have made progress during the life of the Decree.[12]

For understandable reasons, there is great concern about the achievement gap nationwide. *See, e.g.*, Tamar Lewin, *Study*

school system." *Newburg Area Council, Inc. v. Board of Educ. of Jefferson County*, Nos. 7045 & 7291, Findings of Fact and Conclusions of Law: Monitoring Procedures (W.D.Ky. July 30, 1975), at 20 ("Monitoring Procedures").

10. Because the racial guidelines are designed to manage student assignment to *schools*—not classes—the statistical significance of the classroom numbers is doubtful. First, the 15%–50% guidelines have no constitutional significance. The Board chose that number in 1996 for student assignment to schools. The mere fact that classrooms are outside its boundaries has no necessary constitutional meaning. Furthermore, the statistics themselves may prove very little. For instance, since Central High School has about 50% African–American enrollment, it would be neither a surprise nor evidence of a racial imbalance if many or the preponderance of its classes exceeded 50% African–American. Likewise, many schools have between 15% and 20% African–American students. Statistically, then, it is likely that close to 50% of the classes would contain fewer than 15% African–American children.

11. This conclusion applies equally to many other of the Intervenors' arguments. For example, they claim that African–American students are disproportionately disciplined, and to support this claim they introduced data showing that African–Americans are involved in suspension incidences at a higher rate than other students, and that they have a higher rate of recidivism. They failed to note that African–American students are slightly *less* likely to be suspended as a result of a "suspension incidence" than are students of other races. *See* Orig. Intervening Plaintiff's Ex. 2, tab G. Like classroom racial balance, suspensions were only mentioned in the Monitoring

Procedures; they were not a part of the Decree. Those seeking to retain the Decree must also show that the suspensions imbalance is traceable, in a proximate way, to the former de jure segregation. *See supra* note 2. The Intervenors did not even show that the suspensions were the result of discrimination, much less that they are a vestige of the old dual systems.

12. It is very difficult to make confident judgments about the relative academic progress of societal groups. Nevertheless, contrary to some impressions, the evidence presented in this case seems to suggest that African–American student achievement has improved substantially during the Decree's duration. Between the 1992–93 and 1997–98 school years, the KIRIS Reading and Mathematics Indexes for JCPS's African–American students showed large gains in high school and elementary school and modest gains in middle school. Between the 1975–76 and 1997–98 school years, JCPS's African–American nationally normed test results in reading have seen dramatic improvements, especially in middle and high school, while those same results in mathematics have been relatively flat. *See* Orig. Intervening Plaintiffs' Ex. 2, tab K. Yet because whites have also seen similar gains in some test scores, the African–American students' progress has failed to close the achievement gap, except that middle class black children are now usually outperforming white children of lower socio-economic status (as crudely measured by participation in Kentucky's free and reduced lunch program). *See id.* The Court has no historical data on retentions and dropouts, but currently African–Americans have slightly higher dropout and retention rates than do other students. *See* Orig. Intervening Plaintiffs' Ex. 2, tab G.

*Finds Racial Bias in Public Schools*, N.Y. Times, Mar. 1, 2000, at A14. There is no consensus on what causes the achievement gap. Some people attribute it to "institutional racism," while others see schools as "'reproduc[ing] the economic and social disparities of the larger society.'" *Id.* It seems likely that numerous external factors—including high poverty incidence, lower levels of parental education, higher incidence of families without two active parents, frequent moves, and less access to quality pre-school education—produce the disparity. *See* Test. of Dr. Gary Orfield, Vol. II, at 30 (concentrated poverty schools are "one of the basic sources of the educational inequality"), 31 (instability due to high housing turnover).[13]

The Intervenors offer discriminatory teacher attitudes as the primary causal connection between poor educational outcomes for African–Americans and the pre–1975 school system. They say that these attitudes could have two impacts: First, when teachers consider blacks less able, they neglect them in class. Second, for the same reasons, teachers might recommend black students to the Advance Program less frequently.[14] In our case, only casual, anecdotal bemusings by one or two witnesses suggest these possibilities. As a constitutional matter, the Intervenors must show not only that JCPS teachers are biased, but also that their bias is a result of the formerly segregated school systems. The Intervenors presented proof of neither.[15]

The Supreme Court has discouraged assessing relative student achievement in a dissolution decision for the very reason that it is so difficult to discern its root causes. *See Jenkins III*, 515 U.S. at 101–02, 115 S.Ct. 2038 (even where the original remedial order had determined that segregation caused a system-wide reduction of student achievement). Most federal courts looking at the achievement gap issue have declined to even consider it as a vestige. *See, e.g., City of Yonkers*, 197 F.3d at 55; *People Who Care*, 111 F.3d at 537–38; *Coalition to Save Our Children*, 90 F.3d at 776–78; *Capacchione*, 57 F.Supp.2d at 272; *Keyes v. Congress of Hispanic Educators*, 902 F.Supp. 1274, 1282 (D.Colo.1995).[16]

---

**13.** *See also City of Yonkers*, 197 F.3d at 54 (considering "'birth weight, educational and occupational background of parents, parental interest and involvement, single parent status, ... mobility, and other socio-economic factors'") (*quoting U.S. v. City of Yonkers*, 833 F.Supp. 214, 222 (S.D.N.Y.1993)); *Wessmann v. Gittens*, 160 F.3d 790, 803–04 (1st Cir. 1998); *People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 537–38 (7th Cir.1997) (finding many of the causes of an achievement gap beyond the school system's control).

**14.** This exact same connection was the subject of intense scrutiny in *Wessmann*. *See* 160 F.3d at 804–07; *id.* at 820–28 (Lipez, J., dissenting). In that case, the school board's expert used data from Kansas City and applied it to Boston; the data were derived from a "climate survey." Another school system employee did an informal anecdotal study. The *Wessmann* majority found that these studies failed to establish either discriminatory teacher attitudes or a causal connection to the original de jure segregation. *Cf. City of Yonkers*, 197 F.3d at 53. The evidence in our case is much weaker.

**15.** Indeed, JCPS has focused its remedial attention on African–American kids, through Project REACH (a summertime enrichment program), strategically placed Parental Assistance Centers, magnet placement, tutoring, and after-school programs.

**16.** The *Freeman* court did approve the district court's evaluation of—and ultimate retention of judicial control over—"quality of education" in determining the school board's compliance with the Decree. *Freeman*, 503 U.S. at 492, 112 S.Ct. 1430. But by "quality of education" the lower courts in *Freeman* meant merely distribution of educational resources, and never required elimination of an achievement gap among the races. *See Pitts by Pitts v. Freeman*, 887 F.2d 1438, 1445–46 n. 8 (11th Cir.1989); *Mills v. Freeman*, 942 F.Supp. 1449, 1460–62 (N.D.Ga.1996) (assuring that the district court "found that the [school system] could not be deemed to have achieved a unitary status as to quality of education due to deficiencies in the allocation of resources," not the presence of an achievement gap); *id.* at 1461 ("Enshrined in the Constitution is the promise of equal opportunity, not equal outcome."). The parties in *Freeman* did not appeal the district court's

Judge Gordon seems to have recognized these difficulties, and the 1975 Decree is silent as to any such measurement.[17]

Promoting and achieving academic progress for all students, irrespective of race, is the central purpose of a public school system. Teacher attitudes toward students are critical to academic progress. JCPS should always act where improvement is necessary among its teachers. These issues simply highlight the distinction between matters where the Board has the power to act and those where the Court may require action.

For all these reasons, the Court does not find that any persisting achievement gap is a vestige of the former dual system.

### D.

■ The Intervenors also presented statistics on disparate African–American participation in the Advance Program, one of JCPS's options for academically advanced children.[18] In its current incarnation, the Advance Program did not exist in 1975. In fact, when Judge Gordon entered the 1975 Decree, the old Louisville Independent School District had no such program, and the old county school system had only very limited offerings for gifted students. In 1978, Judge Gordon held that the "plaintiffs have not produced any evidence that entry into the Advance Program is barred to black children in this school system," and that disparate participation was not "based on the present results of past segregation." *Haycraft 1978*, at 14–15. The Court reaches the same conclusion today.

While African–Americans are not represented in the Advance Program in proportion to the larger district-wide student population,[19] the statistics presented tell very little about why such an under-representation exists. The only identifiable source of the disparity is that a smaller percentage of African–American than

---

retention of supervision over quality of education, so the Supreme Court did not treat the issue.

**17.** In the "Monitoring Procedures" appended to the Decree, JCPS was required to report the "Number of students who dropped out, were suspended, failed, retained, and the number expelled by school, by grade, by race, for the prior year." Monitoring Procedures, at 21. Other than this glancing request for data, educational achievement was never mentioned, ordered, or sought as part of the original or residual Decree.

Interestingly enough, the original plaintiffs in *Haycraft* and *Newburg* never asserted that the quality of education in all black schools was substandard. In their opening statements, those attorneys stated,

We are *not* contending that schools are racially identifiable because of poor quality or because of substandard education. In *Swann,* the court indicated that those factors would be taken into account. We are proceeding on the supposition that the quality of black schools is substantially the same as the quality of white schools and that the same kind of program is offered. The *only problem* is that schools are racially identifiable.

*Haycraft v. Board of Educ. of Louisville, Ky.,* No. 7291–G, at 3 (W.D.Ky. Mar. 8, 1973); *Newburg Area Council, Inc. v. Board of Educ.* *of Jefferson County, Ky.,* No. 7045, at 7 (W.D.Ky. Mar. 8, 1973) (emphases in original). To be sure, some people then and now might disagree with the lawyers' assessment of school quality. Nevertheless, historically the original plaintiffs never sought to prove unequal educational quality.

**18.** Some of the Intervenors' witnesses disputed the wisdom of ability tracking in general. This case will not address the propriety of ability classifications in JCPS, especially since Kentucky state law affirmatively requires that JCPS offer these kinds of programs for academically gifted or advanced children. *See* 704 Ky. Admin. Reg. 3:285 (1999). Even without this requirement, the Court's role is not to make a policy choice between ability tracking and "mainstream" education, but to assure that the selection process for any program is non-discriminatory.

**19.** Although about 30% of the district's students are African–American, only 12% of elementary students, 11% of middle school students, and 9% of high school students enrolled in the Advanced Program were African–American during the 1997–1998 school year. *See* Orig. Intervening Plaintiffs' Ex. 2, tab W. Moreover, 42% of JCPS's 737 high school Advanced Program classes have no African–American students. *See* Orig. Intervening Plaintiffs' Ex. 2, tab T.

white students take the necessary entrance test.[20] In every other respect, school officials seem to treat African–American and white students equally.

It is unclear why fewer African–American students take the test. Any student is free to take it. No evidence points to an obvious barrier affecting African–American students. Parental or student decisions could make some difference. Teachers' and counselors' recommendations to the Advance Program might simply reflect the known achievement gap already existing. It could be that some teachers and counselors are subconsciously racist in their selections. None of these possibilities is more or less believable than any other. But without any evidence, it would be wrong to make an inference of discrimination. JCPS's numerous remedial programs targeted to African–Americans belie any suggestion that the Advance Program's enrollment is evidence of bad faith.

Some people clearly disagree with the philosophy and implementation of the Advance Program. However, the Interve-

nors did not produce evidence of any discriminatory practice or policy, nor did they show how the potential disparities are proximally, causally related to the prior dual system.[21]

### E.

▇ Finally, the Intervenors allege racial imbalances in the assignment of administrators, teachers, and clerical and paraprofessional staff[22] among JCPS's schools and other facilities. The Intervenors made no claim and presented no evidence that JCPS discriminates in *hiring* administrators, only that it has somehow discriminated in their assignment among its schools. The numbers clearly do not bear this out.

Of the 588 administrators in JCPS, 22% are African–American. *See* Orig. Intervening Plaintiffs' Ex. 2, tab D.[23] Of the 55 all-white school administration staffs, 46 are in elementary schools. Elementary schools only have one principal, one librarian, and one counselor. *See id.* Because the pools from which to choose those ad-

---

20. In the 1999–2000 school year, 7.9% of all African–American students in grades three through nine were tested, while 13.4% of all other students in those grades were tested. *See* Orig. Intervening Plaintiffs' Ex. 5, tab A. The difference was greatest in elementary school. For grades three through five, JCPS tested 10.7% of African–American children and 20.7% of other children. For grades six through eight, JCPS tested 7.5% of African–Americans students and 9.7% of other students. For grade nine, JCPS tested 0.2% of African–American children and 2.4% of other children. *See id.*

21. This conclusion applies with similar force to the Intervenors' evidence about African–American participation in Advanced Placement courses. Because Advanced Placement courses are neither *Green* factors nor elements of the desegregation Decree, racial disparities in those courses—which are college-level classes and have no relationship to the Advance Program—are also not entitled to the causation presumption. The Intervenors produced evidence that only 7.7% of the 2192 high school students taking Advanced Placement classes are African–American, and that 34.9% of Advanced Placement classes have no African–American students enrolled. *See* Orig. Intervening Plaintiffs' Ex. 2, tab L. No

evidence was presented about the enrollment methods and criteria for Advanced Placement courses, nor did the Intervenors show discrimination in their operation. Although these figures do not represent the African–American population as a whole, the parties seeking to retain the Decree bear the burden of showing that these imbalances are traceable, in a proximate way, to the old dual systems. Because they introduced no evidence on that crucial matter, the Court must conclude that the Advanced Placement classes are not a vestige of de jure segregation.

22. Because clerical and paraprofessional staff were never a part of the Decree, it was incumbent upon the Intervenors to show that any racial imbalance in that staff is the result of discrimination or is otherwise somehow connected to the pre–1975 dual system. They failed to show this, so the Court cannot consider imbalances in the distribution of such employees as vestiges of de jure segregation.

23. More particularly, 28% of the principals, 7% of the librarians, 26% of the counselors, and 27% of the assistant principals are African–American.

ministrators are 72%, 93%, and 74% non-African-American, respectively, the random chance that an elementary school's administration will be all-white is about 50%. Therefore, there is nothing inherently suspicious about the fact that 46 of the 84 elementary schools—or 55%—have all-white administrations.[24]

As to teachers, the Intervenors produced data showing that, although 12.2% of JCPS's tenured high school teachers are African–American, they teach only 5% of the high school Advance Program classes, 8.6% of the high school honors classes, and 5.8% of the Advanced Placement classes. *See* Orig. Intervening Plaintiffs' Ex. 2, tabs E, L, & T.[25] Again, the Court cannot make an inference of discrimination from these figures. Although teacher assignment is a *Green* factor, that index is assignment of teachers to schools, not to classes. *See Newburg,* Findings of Fact and Conclusions of Law: Employee Personnel, at 14–15. Therefore this imbalance—whatever its significance—does not enjoy a presumption of being caused by de jure segregation. No evidence suggests that JCPS engages in any effort not to assign African–American teachers to higher-level classes.[26]

## V.

### GOOD FAITH COMPLIANCE WITH THE DECREE

█ The Court's assessment of good faith compliance with the Decree and,

more importantly, the Board's "commit[ment] to the ideal of an integrated system," goes to the very essence of whether to continue or to dissolve the Decree. *Dowell,* 498 U.S. at 261 n. 6, 111 S.Ct. 630 (Marshall, J., dissenting). The Court does not start from an entirely blank slate. In 1978, when Judge Gordon ended active court supervision of the schools, he gave a ringing endorsement of the Board's commitment to successful implementation of the desegregation Decree. *See Haycraft 1978,* at 3–8. Similarly, in 1985, Judge Ballantine found no evidence that the Board had sought to evade the Decree.

Everyone concedes that since 1975 JCPS has maintained the percentage of African–American students attending each school within acceptable racial guidelines. JCPS has created an entire department whose principal duty is assigning students to schools of their choice or convenience while preserving a specific racial balance in each school. To accomplish this objective in the face of the myriad parent questions and concerns has required extraordinary dedication and skill on the part of JCPS administrators.

Jefferson County is nationally acknowledged as one of the most thorough and successful desegregation plans in the nation. See Brian L. Fife, *In Defense of Mandated School Desegregation Plans:*

---

24. (0.74) × (0.93) × (0.72) = 0.4955, or roughly 50%. The other nine schools with all-white administrations are all special facilities—such as Ten Broeck, Spring Meadows, Maryhurst, the Spring Academy, Louisville Day Treatment, the Churchill Park Rehabilitation School, the TAPP school—all of which have only one or two administrators total. The random probability that such small staffs would have no African–Americans is even higher than that for elementary schools. Finally, not a single middle or high school has an all-white administration. *See id.*

25. The district wide percentage of African–American teachers for all twelve grades is 14.9%, but the percentages of African–Ameri-

cans teaching Advance Program and honors classes at the elementary and middle school levels are unknown.

26. The Intervenors' suggestion that each school must have an African–American to serve as a role model does not pass constitutional muster. The Supreme Court long ago rejected the role-model theory as a compelling state interest for the use of race in school employment decisions. *See Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 275–76, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) ("Carried to its logical extreme, the idea that black students are better off with black teachers could lead to the very system the Court rejected in *Brown v. Board of Education.*").

*An Analysis of Kentucky's Jefferson County Experience,* 25 Equity & Excellence 100, 100–05 (1992). Indeed, the Defendants' own witness, Dr. Orfield, testified and has published that Jefferson County is the most or one of the most desegregated major urban school systems. *See* Gary Orfield & John T. Yun, *Resegregation in American Schools* 15 (1999); Gary Orfield, *Public Sch. Deseg. in the U.S., 1968–1980,* at 5, 40 (1983); Test. of Dr. Orfield, Vol. II, at 116. The Court concludes that JCPS has consistently met the many and varied challenges presented to it.

Throughout the lengthy hearings, no one produced evidence that the Board sanctioned discriminatory acts. The Intervenors focused on the achievement gap between African–American and other school children. However, no evidence suggests that Board policies are responsible for it.[27] In fact, the Board has expended considerable energy and resources to resolve that gap. As discussed previously, the Intervenors' evidence of imbalances in various parts of the school system does not show any district-wide policy or practice from which the Court could infer bad faith.

The Board's dedication to quality education and racial equity are evident in many aspects of its conduct. JCPS offers after-school, tutoring, and summer programs aimed specifically at supplementing the education of children who need extra help, giving them a real chance to excel. When the Board created the Parent Assistance Centers to help parents navigate the array of optional programs, it targeted African–Americans by choosing locations that would serve them best. Moreover, the Board has taken affirmative steps to build strong public support for its policy of racial balancing, even when the remedial needs of the 1960s and 1970s began to clash with changing educational, social, political, and legal perspectives in the late 1980s and 1990s. The Board's commitment to the ideal of an integrated school system has been so strong that it continued that commitment even after it was unclear whether Supreme Court precedent or the Decree required it. Successive boards and administrations seem to have dedicated themselves to constitutional behavior. In the process, JCPS has set an example for this community.

For the past fifteen years, since before the last hearing in *Haycraft,* and throughout this lawsuit, the Board steadfastly maintained its desire for an integrated, nondiscriminatory school system. JCPS has treated the ideal of an integrated system as much more than a legal obligation—they consider it a positive, desirable policy and an essential element of any well-rounded public school education. This Court joins Judges Gordon and Ballantine in finding overwhelming evidence of the Board's good faith compliance with the desegregation Decree and its underlying purposes.

The Court's finding of good faith has great practical value and legal significance. The Board has extinguished "root and branch" those institutional attitudes which enabled the former dual systems and their accompanying policies and practices. This is the most important goal of desegregation, and its achievement is deeply meaningful. Because JCPS has demonstrated good faith over such a long period of time, the Court, the students, the parents, and the community can be justifiably confident that the Board will never again condone segregation or any other form of discrimination against African–American students. Everyone associated with JCPS over the past twenty-five years deserves this community's thanks and praise for their role in this success.

## VI.

### THE LATENT DEMOGRAPHIC IMBALANCE

The Board joined in none of the Intervenors' arguments. The heart of its argu-

---

27.  *See supra* Section IV.C.

ment is that, should this Court dissolve the Decree, its schools would begin to "resegregate." [28] It is true that without using race in student assignment, many of those schools will vary significantly from the district-wide racial means. [29] As a result, the Board contends that black students will tend to "suffer greatly" in schools having concentrations of poverty. Trans. of JCPS's Closing Argument, at 39–40 (Mar.

28, 2000). The Board also says that racially identifiable schools are a vestige and that the Decree should be maintained to prevent their re-emergence. [30]

Their legal argument is more straightforward: Plaintiff has failed to meet its burden of proof by coming forward with evidence that the current racial demography and its accompanying vestiges are not related to the pre–1975 dual system. [31] In-

[28]. The term "resegregation" is an improper and misleading description of this phenomenon. Segregation is the conscious, deliberate act of separating people by race. A return of some schools to an African–American majority because of a certain racial demography could be a vestige of the former segregation, but it is not an act of segregation itself.

[29]. More particularly, if JCPS went to a policy of strictly neighborhood schools, with no choice but to attend a school in geographic proximity to the home, the results would be as follows: Of the 87 elementary schools, 13 would be more than 80% African–American, 8 between 51% and 79%, 10 between 10% and 14%, 28 less than 10%, and the remaining 28 between 15% and 50%. The district-wide elementary school student population is currently 34.8% African–American. Of the 24 middle schools, 2 would be more than 80% African–American, 3 between 51% and 79%, 2 between 10% and 14%, 5 less than 10%, and the remaining 12 between 15% and 50%. The district-wide middle school student population is currently 32.4% African–American. Of the 21 high schools, 2 would be more than 80% African–American, 3 between 10% and 14%, 3 less than 10%, and the remaining 13 between 15% and 50%. The district-wide high school student population is currently 26.9% African–American. *See* Defendants' Ex. 5, Scenario # 1.

On the other hand, if JCPS used its current choice programs (such as magnets and open enrollment options) in conjunction with basic neighborhood school assignment, the results would be less racially identifiable. Of the 87 elementary schools, 7 would be more than 80% African–American, 11 between 51% and 79%, 9 between 10% and 14%, 25 less than 10%, and the remaining 35 between 15% and 50%. Of the 24 middle schools, none would be more than 80% African–American, 3 between 51% and 79%, 1 between 10% and 14%, 5 less than 10%, and the remaining 15 between 15% and 50%. Of the 21 high schools, none would be more than 80% African–American, 3 between 51% and 79%, 3

between 10% and 14%, none less than 10%, and the remaining 15 between 15% and 50%. *See* Defendants' Ex. 5, Scenario # 4. If JCPS could still use its resides areas in conjunction with maximum school choice, virtually none of its middle or high schools would be outside 15%/50%, though many elementary schools would. *See* Defendants' Ex. 5, Scenario # 6.

[30]. During the oral argument, the Court had an opportunity to fully explore the Board's position. It is clear that the Board is convinced that integrated schools provide a better educational setting for all students; that the concentrations of poverty which may arise in neighborhood schools are much more likely to adversely affect black students than whites. The Board says that it wants only the full power to be "responsive to the people of this community who elected them." Trans. of JCPS's Closing Argument, at 52 (Mar. 28, 2000). To do so, it wants the power to continue a fully integrated school system.

[31]. A student assignment plan based primarily on neighborhood residence would result in some schools with very white and very black student populations. In its first Memorandum Opinion, this Court did recognize a separate class of "concealed" or "latent" racial imbalances in student assignment. *See Hampton I*, 72 F.Supp.2d at 781–82 & nn. 45–46 ("in a provisionally unitary system, vestiges of segregation may remain even if those vestiges have no facial manifestation"). These latent imbalances could emerge in the absence of the decree as a reflection of the county's underlying racial demography, and they are the kind explored in some depth in *Dowell*. *See* 498 U.S. at 245, 111 S.Ct. 630.

As to this special class of imbalances, the parties seeking to maintain the decree clearly bear the burden of proving that they will emerge if the decree is lifted. But once the likelihood of emergence is shown conclusively, this Court has said that the parties seeking to end the decree must disprove causation or show the impracticability or inutility of a continuing decree. *See Freeman*, 503 U.S. at

deed, the burden of proof is no mere legal nicety; rather, it is a substantive allocation of initial presumptions and rights. *See, e.g.,* Karl N. Llewellyn, *The Bramble Bush* 94–95 (Oceana Publications, Inc. 1996) (1930) ("The differentiation between substantive law and adjective law is an illusion .... the law can be seen only in its *effects.*"). The Supreme Court is well aware of the retentive effects that *Green's* presumption of causation has on desegregation decrees, and yet the presumption remains. *See, e.g., Freeman,* 503 U.S. at 505–07, 112 S.Ct. 1430 (Scalia, J., concurring); *id.* at 515–18, 112 S.Ct. 1430 (Blackmun, Stevens & O'Connor, JJ., concurring in the judgment). In any event, it is not the burden of proof that might resolve this issue, but rather the parties' execution of that burden.

To be blunt, Plaintiffs put on no direct evidence at all as to causation. Their entire case was cross-examination, and they proved little more than what was already uncontroverted: that the board has been in compliance with its own student assignment guidelines for the past twenty-five years. They introduced no evidence disproving or even addressing a causal connection between the old dual systems and the racially imbalanced demography of Jefferson County.

The Court is left with two stubborn but competing realities: Plaintiffs have failed to meet the burden of showing that the county's latent racial demography is not related to the pre–1975 dual system, but neither Judge Gordon nor the Sixth Circuit ever made a finding that the Board's past segregation policies caused the past or current residential demography in Jefferson County. In fact, there is not now, nor has there ever been, any evidence that JCPS directly caused the racially imbalanced housing patterns in Jefferson County. Thus, the Court is confronted with a troubling disjunction between the consequence of the burden of proof and the actual, historical record.

The Court has given deep thought to understanding the historic role of racial demography in previous desegregation cases as well as its significance in this case. The reasons that bussing and integration were originally needed in JCPS is similar to those in *Dowell.*[32] Jefferson County's demography was significantly concentrated by race, which, among other factors, prevented the natural desegregation of the schools. In this sense, demography certainly caused racial imbalance in

491–92, 112 S.Ct. 1430. Student assignment is the quintessential *Green* factor, so racial imbalances in student assignment are presumed to be caused by the Board's prior unconstitutional behavior. *See supra* note 2. In *Hampton I,* the Court directed that if Defendants prove that alleged future imbalances will occur, the burden shifts to the Plaintiffs, who must then "bear the burden of showing good faith and no vestiges." *Hampton I,* 72 F.Supp.2d at 782. The Court further elaborated that, to meet this burden, Plaintiff must "prove that nothing links the suspicious condition to the earlier constitutional violation." *Id.* at 782 n. 46. What makes this problem even more difficult is that, unlike DeKalb County in the *Freeman* case, Jefferson County seems to be racially concentrated in the same places it was twenty-five years ago. There has been change, but there were not the same kinds of racially dramatic population shifts found in *Freeman. See* 503 U.S. at 475, 112 S.Ct. 1430.

32. The proof in our case closely resembles that in *Dowell.* After remand from the Supreme Court and dissolution of the Decree by the district court, the Tenth Circuit in *Dowell* noted:

Although the district court had ... previously observed that a neighborhood schools policy "superimposed over already existing residential segregation ... leads inexorably to continued· school segregation," 244 F.Supp. at 976, the district court here did not clearly err in finding that this observation related to the court's rejection of the neighborhood schools policy as a remedy for *de jure* segregation, not to its explanation of the causes of residential segregation. *See Dowell,* 778 F.Supp. at 1169 n. 44.

*Dowell by Dowell v. Board of Educ. of Okla. City Pub. Schs.,* 8 F.3d 1501, 1517 (10th Cir. 1993). Likewise, the Sixth Circuit's rejection of neighborhood schools in 1973 contained no implication that JCPS had caused residential segregation.

a system with neighborhood schools. But this community's racial housing patterns are probably a complex result of pre–1917 racial zoning restrictions, pre-*Shelley* racially restrictive covenants, decisions about geographic placement of public housing, "white flight" after the school's initial 1956 desegregation, numerous socioeconomic factors, and personal choice. *See* Test. of Dr. Orfield; Test. of Dr. Hudson; Test. of Debra Stallworth; Post–Hearing Memo, of Intervening Plaintiff Amer. Civ. Liberties Union of Ky., at 12–14. The only obvious impact of school policies is the lingering impact of white flight, which was caused by a policy of open-door desegregation rather than active integration.[33]

This Court can probably not solve this quandary, nor does the case turn upon the answer. Rather, a deep consideration and understanding of the essential purposes of the Decree, the Court concludes, holds the key to a fair and just resolution of the case. To do so requires the Court to consider these three fundamental questions: (1) whether eliminating the county's racial demography was ever a goal of the Decree, (2) whether there is anything the Board can practicably do to eliminate that demography, and (3) whether the racially identifiable schools anticipated here would revive the stigma associated with segregated schools.

## VII.

## THE IMPORTANCE OF PRACTICABILITY AND STIGMA

To eradicate segregated schools and to assure that they would never return were the Decree's most important and visible purposes. The Board's good faith compliance has accomplished both these objectives. Even though segregation is ended forever, the Court must confront the reality that absent the Decree some majority-black schools are likely to re-emerge. Did the District Court or the Sixth Circuit intend the Decree to change Jefferson County's racial demography to achieve permanent non-racial housing patterns? The Court concludes that neither Judge Gordon nor the Sixth Circuit intended such a change.[34] Their opinions make no mention of requiring demographic integration, nor can such a goal be inferred from contemporaneous Supreme Court precedents. To be sure, such a result may have been the goal of some and a hoped-for consequence of others. However, it was not the constitutional objective. Generally, courts have not required that schools change demography. *See Dowell,* 498 U.S. at 247–50, 111 S.Ct. 630; *Kalamazoo,* 640 F.2d at 815 (expressing doubt that neighborhood segregation can be the basis for granting ancillary relief long af-

---

**33.** In 1956, both local school systems desegregated in the technical sense, opening the schools to children of any race. In 1973, following the Supreme Court's decisions in *Green* and *Swann,* the Sixth Circuit held that this passive desegregation was not sufficient in the absence of a unitary system or a period of good faith and prolonged integration. *See infra* note 34.

**34.** To its credit, one party did confront this question directly. *See* Post–Hearing Memo. of Intervening Plaintiff Amer. Civ. Liberties Union of Ky., at 12. In that brief, the Intervenor argued that the Sixth Circuit required JCPS to remedy the effect of segregated housing patterns on the school district. The Court disagrees with this interpretation of the holding in *Newburg. See Newburg Area Council, Inc. v. Board of Educ. of Jefferson County, Ky.,*

489 F.2d 925, 931 (6th Cir.1973). Rather, the appellate court held that the "Board must show that the racial composition of these schools is not the result of past discriminatory action on its part." *Id.* In 1973, there was no history of good faith and no period of time in which the school system was fully integrated, so the stigma of segregation associated with majority-black schools was unavoidable and real. Affirmative action was necessary. *Newburg* merely held that until a school system achieves unitary status, geographic student assignment is not sufficient to undo the "residual effects of past discrimination." *Id.* Nothing in that opinion suggests that JCPS must keep bussing until the demographics of Jefferson County undergo a racially integrative change.

ter the school system has been desegregated).

Significantly, no one has suggested that continuation of the Decree has a realistic chance of achieving demographic integration. Kentucky school boards may be powerful, but they cannot move people within the county. No one has linked these twenty-five years of bussing with whatever degree of residential integration has occurred during that time. At oral argument and in their briefs, neither the Board nor the Intervenors could propose any effects—hypothetical or real—on Jefferson County's demography from a continued Decree. They suggested only that additional time with non-neighborhood schools might stimulate more residential integration. This speculation is one contradicted rather than supported by the empirical evidence. See Steven G. Rivkin, *Residential Segregation & School Integration,* 67 Sociology of Educ. 279, 279 (1994) ("The evidence indicates that U.S. schools remain highly segregated primarily because of the continued residential segregation of Blacks and Whites and that school-integration efforts have had little long-term effect on residential segregation."). Indeed, the Defendants' own expert testified that, in a city like Louisville, where there have been no segregated schools for twenty-five years, the school system's residual effect on residential racial patterns is not substantial. See Test. of Dr. Orfield, Vol. II, at 102.[35] This Court

cannot find any reported case stating that a desegregation decree has required or facilitated such an integrative change of racial demographics. Over time and for many reasons, housing patterns do change, but it would be an exercise in futility to require that JCPS implement such changes.[36]

Under *Dowell* and *Freeman,* "the phrase 'to the extent practicable' implies a reasonable limit on the duration of ... federal supervision." *Coalition to Save Our Children,* 90 F.3d at 760. Plainly, practicability is a measure of feasibility. *See Brown v. Board of Educ. of Topeka, Shawnee County, Kan.,* 978 F.2d 585, 589 n. 4 (10th Cir.1992). The *Dowell* district court, remand from the Supreme Court, recognized that schools cannot change demography:

> The Board does not have the power or capability to redress residential segregation in Oklahoma City, and therefore any such residential segregation that might be considered a vestige of former *de jure* school segregation has in any event been eliminated "to the extent practicable." Bussing school students clearly does not counter such residential segregation effectively....
>
> . . . .
>
> Neither the Board nor this court, after all, has any authority over housing.... The evidence in fact indicated that no desegregation decree has had the effect

---

**35.** Dr. Orfield did testify that, in the absence of the Decree, integrated neighborhoods were at risk to return to white neighborhoods or black neighborhoods. But he also testified that most whites in integrated neighborhoods do not have school-age children or children attending public schools, so their ultimate effect on student assignment is, at best, insubstantial. See Test. of Dr. Orfield, Vol. II, at 50, 56–57, 95–97.

**36.** It is a bedrock principle of equity that the law compels no one to do futile or impossible things. *Lex neminem cogit ad vana seu inutilia peragenda. See, e.g., Candies Towing Co. v. M/V B & C Eserman,* 673 F.2d 91, 95 & n. 3 (5th Cir.1982); *Calcote v. Texas Pac. Coal &*

*Oil Co.,* 157 F.2d 216, 221 & n. 13 (5th Cir.1946). Lex non cogit ad impossibilia. *See, e.g., Hughey v. JMS Dev. Corp.,* 78 F.3d 1523, 1530 (11th Cir.1996); *Cherry–Burrell Corp. v. United States,* 367 F.2d 669, 676 (8th Cir.1966). From the perspective of JCPS, the demographic imbalance's total lack of redressability speaks to the futility of continuing the Decree. *See Capacchione,* 57 F.Supp.2d at 260; *Stell v. Board of Pub. Educ. for the City of Savannah,* 860 F.Supp. 1563, 1574–75 & n. 22 (S.D.Ga.1994); *see also United States v. Unified Sch. Dist. No. 500, Kan. City (Wyandotte County), Kan.,* 974 F.Supp. 1367, 1377–78 (D.Kan.1997); *Tasby v. Woolery,* 869 F.Supp. 454, 461 (N.D.Tex.1994).

of eliminating residential segregation anywhere in America.

*Dowell v. Board of Educ. of Okla. City Pub. Schs.*, 778 F.Supp. 1144, 1171–72 (W.D.Okla.1991).[37] One might ask, if the objective of changing demographics is impracticable now, was it not equally impracticable twenty-five years ago? The affirmative answer only emphasizes the Court's conclusion that changing our racial demography or designing a permanent racial balance were never the Decree's ultimate goals. Rather, masking that racial demography was a necessary temporary measure to accomplish more fundamental objectives.

The core of the Decree encompasses that *even more ambitious and fundamental purpose. That purpose is to assure the community—particularly those against whom segregation was directed—that the re-emergence of majority-black schools does not revive the stigma or message of inferiority once associated with segregation.* That is why the Court must consider the need to keep masking those demographics to prevent the purported stigma. The Court reaches this conclusion after careful study of the opinions underlying the rationale of the early desegregation cases.

*Brown* and the post-*Brown* cases said that state-imposed segregation created a badge of inferiority and degradation. *See Brown I*, 347 U.S. at 494, 74 S.Ct. 686. *Brown* required school boards to stop segregation and to end discrimination. Later cases required more. They ordered school boards to remove the outward reminders—the vestiges—of discrimination "root

and branch." The constitutional purpose of all this was never to change housing patterns. The purpose was to remove the visible reminders—vestiges—of segregation to prevent a revival of the message of inferiority that might make one question whether a school system had returned to its old ways. That required affirmative rather than passive action, it required good faith, and it required time. Dissenting in *Dowell*, Justice Marshall stated the concept most eloquently:

> This focus on achieving and preserving an integrated school system ... stems from the recognition that the reemergence of racial separation in such schools may revive the message of racial inferiority implicit in the former policy of state-enforced segregation.

*Dowell*, 498 U.S. at 259–60, 111 S.Ct. 630 (Marshall, J., dissenting) (quotations and citation omitted). Though Justice Marshall spoke for a minority in that case, a majority of the justices might well have agreed with these general moral principles.[38] Justice Marshall's greatest service in that case was to explore intimately the nature, causes, and significance of stigma.

The message of racial inferiority implicit in segregation was an objective message—sent from the school system to African–Americans. *See Brown I*, 347 U.S. at 494–95, 74 S.Ct. 686 (public school segregation committed under the sanction of law denotes the inferiority of the minority group). Even if some schools would now have majority-black student bodies, it is difficult to see that JCPS is sending any such message. To stigmatize, one must

---

37. Because it accepted the district court's conclusion that the current demographic in Oklahoma City was not traceable in a proximate way to the prior de jure violation, the Tenth Circuit specifically did not "address the district court's conclusion that insofar as current residential segregation is a vestige of past discrimination it has been eliminated to the extent practicable." *Dowell*, 8 F.3d at 1517.

38. Marshall's dissent is instructive in a variety of ways. It sets the fault line which defines

the majority view. Marshall believed that the essential purpose of any desegregation decree was to create a fully integrated school system. *See id.* at 252–68, 111 S.Ct. 630. His view might require JCPS to change racial demographics it was never charged with causing or would require the Decree to continue perpetually to integrate a school system. Neither requirement would represent the majority sentiment as to this case.

categorize, classify, label, or separate a person or group in a demeaning or negative way. The evidence of good faith demonstrates that the current Board considers all its students as of equal worth and ability. In the current system, African–Americans and students of all races have choices about which school they may attend. The experience of the last twenty-five years causes the Court to anticipate that JCPS will continue these choices. To allow such a choice does not now send a message of inferiority. African–Americans may choose to attend a neighborhood school, a majority-black school, or any other school or program. By allowing these choices, JCPS does not stigmatize those students at majority-black schools.

If nothing much had changed since 1975, majority-black schools under any circumstances would be constitutionally impermissible. Yet a lot has changed. Students are no longer forced to attend certain schools with other children of their own race. The current racial balance in our schools proves this. For most children and their parents, the right to attend the public school of their choice is one unimpeded by fear, lack of knowledge, or intimidation. The thousands of voluntary choices African–American students and their parents make each year prove this. Some of our best schools now exist in some of our most economically depressed areas. Some of those schools were formerly majority-black. None of this happened overnight. Several generations of school age students have now experienced the benefits of a completely integrated school system and one which is increasingly so by the voluntary choices of its students and their parents. All of these accomplishments can be traced to the Board's policies, actions, and good faith. Therefore, the Court concludes that even the re-emergence of majority-black schools will not revive a message of racial inferiority from the pre-1975 school systems.

## VIII.

## THE DECREE IS DISSOLVED

Some have treated the lawsuit as a referendum on whether the federal courts should prefer integrated schools or neighborhood schools. That is simply not the case. It would be wrong for a federal court to impose either one upon an elected local school board as a matter of educational policy. School boards exist to debate and consider these issues. The Court's role is more limited; to stake out the constitutional parameters within which the Board is free to exercise its discretion—wisely, foolishly, cautiously, bravely, astutely, as the case may be.

Some have said that what is at stake is the very ability of students to have access to equal opportunity in education. The implication is that, without the Decree, our community will suffer irreparably and the quality of education will deteriorate. This suggestion makes too much of this moment and gives too little credit to those who care about education in this community. To be sure, when the Board has more freedom to craft educational policy, this Court cannot guarantee that it will do so with ideal judgment. Whatever change does occur, this Court cannot guarantee that everyone will like it. Based on the evidence, however, the Court feels confident that the Board will act constitutionally. The same determination, good faith, and drive for excellence which the Board and its employees have shown for the past twenty-five years will serve it equally well in future challenges.

The Supreme Court has firmly held that desegregation decrees are temporary measures, and has stated a purpose of returning school systems to democratically elected local control as expeditiously as possible. *See Freeman*, 503 U.S. at 490, 112 S.Ct. 1430 (" 'local autonomy of school districts is a vital national tradition,' " and "[r]eturning schools to the control of local authorities at the earliest practicable date is essential to restore their true accounta-

bility in our governmental system") (citation omitted).[39] If JCPS must continue under the Decree until the county's residential demographics change, then the Decree would survive perpetually, with no prospect of an end. *See Dowell,* 498 U.S. at 248, 111 S.Ct. 630 (school desegregation decrees "are not intended to operate in perpetuity").

The 1975 desegregation Decree sought to integrate the school systems and eradicate the stigma of segregation. After twenty-five years this Court concludes that the Decree has profoundly succeeded in those purposes. Confronted with the complete disappearance of de jure discrimination, the impracticability that any further Board policy will appreciably change our racial demography, vibrant democratic debate about educational policy, and decades of good faith on the part of the Board, the Court concludes that JCPS should be free to adopt its student assignment plans without the dictates of a continuing Decree.

## IX.

### THE CONSEQUENCES OF DISSOLVING THE DECREE

■ The Court's focus returns necessarily to the Plaintiffs' original complaint— the use of race in assigning students to the Central High Magnet Career Academy. Central is one of very few JCPS high schools with no geographic attendance base; all of its students apply for and participate in one of four special magnet programs—business, law and government, computer technology, and medicine. Central's racial composition is right at 50% African–American, and its enrollment is about 300 or 400 students below capacity. To keep enrollment within the racial guideline, JCPS will not admit any more black students unless it also attracts an equal number of non-black students. As a result, for the 1999–2000 school year as in preceding years, JCPS turned away many African–American applicants to Central solely on the basis of their race.[40] The Plaintiffs are among these rejected applicants. The Board does not dispute that the Plaintiffs are denied the equal opportunity to enroll in these programs on account of their race.

Under the Decree, the 15%–50% student assignment guidelines were shielded from normal constitutional scrutiny. *See Hampton I,* 72 F.Supp.2d at 777–78. Now that the Decree is dissolved, however, any uses of race in student assignment must be "narrowly tailored measures that further compelling governmental interests." *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). While strict scrutiny is an exacting standard, it is not intended as a mere euphemism for the summary disposal of all governmental uses of race. There are racial classifications that can pass constitutional muster:

> [W]e wish to dispel the notion that strict scrutiny is 'strict in theory, but fatal in

---

**39.** This same general principle applies even when the Board does not join in the request to dissolve the Decree. Nevertheless, it goes without saying that the Board's legal position and its precise arguments for continuing the Decree were of great concern and interest for the Court.

**40.** The JCPS student assignment director testified that, for the 1999–2000 school year, 133 African–Americans were rejected from Central solely on the basis of race. *See* Test. of Patricia Todd, Vol. V, at 7. Another witness— the principal of Central—put this number at between 350 and 400 rejected African–Ameri-

can students. *See* Test. of Harold Fenderson, Vol. V, at 232.

The application materials for the Central programs state that applicants may be asked to provide an essay, survey, recommendations, or work samples. Additionally, the school may review grades, standardized test scores, and attendance or behavior data. *See Pondering your next move? A Guide to Optional Programs and Magnet Schs. for Elementary, Middle, and High School Students for 1999–2000,* at 30 (JCPS 1998); Test. of Patricia Todd, Vol. V, at 30. There is no evidence that any such materials are ever requested of white applicants to Central.

fact.' The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it. *Id.* at 237, 115 S.Ct. 2097 (citation omitted). If necessary to serve a compelling interest, JCPS may use race in student assignment.

The Supreme Court has never held that remedying past state-sponsored discrimination is the only interest capable of surviving strict scrutiny. *See Wittmer v. Peters,* 87 F.3d 916, 919–20 (7th Cir.1996); *Hunter v. Regents of the Univ. of Cal.,* 971 F.Supp. 1316, 1325 (C.D.Cal.1997). If a "truly powerful and worthy concern" motivates JCPS's use of race, the interest is compelling. *Wittmer,* 87 F.3d at 918. The question, therefore, is whether JCPS's use of race in its student assignment policy for Central serves such an interest.

### A.

One such interest might be educational diversity. In *Regents of the University of California v. Bakke,* Justice Powell, stated that "attainment of a diverse student body ... clearly is a constitutionally permissible goal for an institution of higher education." 438 U.S. 265, 311–12, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).[41] The Supreme Court has never considered, however, whether educational diversity could be a compelling goal of public secondary education. The Board has made a strong case that diversity is vital to prepare students for today's workplace. While this question is important and difficult, the Court need not answer it today as to the Central assignment policy. *Bakke* and lower court diversity

decisions have emphasized that neither intellectual nor educational diversity can serve as a compelling interest for a hard racial quota.

> Ethnic diversity ... is only one element in a range of factors a university properly may consider in attaining the goal of a heterogenous student body....
>
> It may be assumed that the reservation of a specified number of seats in each class for individuals from the preferred ethnic groups would contribute to the attainment of considerable ethnic diversity in the student body. But petitioner's argument that this is the only effective means of serving the interest of diversity is seriously flawed. In a most fundamental sense the argument misconceives the nature of the state interest that would justify consideration of race or ethnic background. It is not an interest of simple ethnic diversity .... *The diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element.* Petitioner's special admissions program, focused *solely* on ethnic diversity, would hinder rather than further attainment of genuine diversity.

*Id.* at 314–315, 98 S.Ct. 2733 (emphasis added); *see also Wessmann,* 160 F.3d at 796–98.

Central has two admissions tracks: one exclusively for blacks, and another for everyone else. For African–American applicants, "diversity" at Central means nothing more than racial composition in relation to capacity. JCPS does not assign students to Central based on their academic success, sex, socio-economic

---

**41.** *See also id.* at 312–13, 98 S.Ct. 2733; *Metro Broadcasting, Inc. v. Federal Communications Comm'n,* 497 U.S. 547, 566–68, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990); *Wygant,* 476 U.S. at 286, 106 S.Ct. 1842 ("although its precise contours are uncertain, a state interest in the promotion of racial diversity has been found sufficiently 'compelling,' at least in the context of higher education, to support

the use of racial considerations in furthering that interest"). Other courts have characterized that conclusion as dicta, and held that diversity cannot serve as a compelling interest. *See Lutheran Church—Missouri Synod v. Federal Communications Comm'n,* 141 F.3d 344, 354–56 (D.C.Cir.1998); *Hopwood v. Texas,* 78 F.3d 932, 945 & n. 27 (5th Cir.1996).

background, family background, extracurricular interest, life experiences, or the myriad other educational or cultural axes too numerous and subjective for the Court to devise. For many applicants, only race matters. To JCPS, a student is either "black" or "other." While that "two-track" system may have been appropriate (indeed, crucial) for desegregating the school system, under Supreme Court precedent it is much too narrow to support the interest of educational diversity.

JCPS could devise a method of student assignment to promote the arguably compelling interest of diversity, which could include a racial component. Indeed, particularly in its magnet schools and programs, JCPS might use race, alongside other important non-ethnic measures of diversity, as the kind of "plus-factor" envisioned in *Bakke*. Without any doubt, however, the current student assignment method for Central—which fixates only on race—does not satisfy any diversity analysis and must be stopped.

### B.

*Brown* and its progeny established a moral imperative to eradicate racial injustice in the public schools. Diverse schools are certainly a means to that end. Maintaining a desegregated school system is another, particularly after a school board has labored so long and successfully to change its own public messages and the personal attitudes of its employees. No court has had occasion to carefully consider the manner in which such a powerful and worthy concern may qualify as a compelling interest, if narrowly tailored to protect individual rights.

If JCPS voluntarily chooses to maintain desegregated schools, it acts with the traditional authority invested in a democratically elected school board:

> School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion of the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities . . . .

*Swann*, 402 U.S. at 16, 91 S.Ct. 1267; *see also McDaniel v. Barresi*, 402 U.S. 39, 40–41, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971). The Supreme Court has consistently lauded the "ultimate objective" of returning school districts to control by local authorities, since " 'local autonomy of school districts is a vital national tradition.' " *Freeman*, 503 U.S. at 489–90, 112 S.Ct. 1430 (quoting *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 410, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977)). The history and purposes of public school desegregation are ill-served if courts make the concept of local control a one-way street to neighborhood schools. Cohering to the long history of desegregation efforts designed by *Brown*, *Green*, and *Swann*, voluntary maintenance of the desegregated school system should be considered a compelling state interest.[42]

In addition to its historical and moral bases, this compelling interest is rooted in practicality and logic. It is incongruous that a federal court could at one moment require a school board to use race to prevent resegregation of the system, and at the very next moment prohibit that same policy. The Board's constitutional duty to

---

**42.** See *Johnson v. Board of Educ. of the City of Chicago*, 604 F.2d 504, 516 (7th Cir.1979), *vacated and remanded on other grounds*, 449 U.S. 915, 101 S.Ct. 339, 66 L.Ed.2d 162 (1980) *and* 457 U.S. 52, 102 S.Ct. 2223, 72 L.Ed.2d 668 (1982) ("The Board's articulated purpose for the [voluntary] adoption of the Plans was the alleviation of *de facto* segregation at Gage Park and Morgan Park High Schools. We find the state interest in promoting integration in these two high schools and communities, while at the same time affording all students residing in these attendance areas a viable opportunity to attend high school in an integrated setting, to be compelling.").

desegregate is not coextensive with its power to integrate. When the Supreme Court mandated that the vestiges of de jure public school segregation "be eliminated root and branch," it contemplated no necessary quantitative limits on school boards' power to achieve desegregation and prevent its return. *Green*, 391 U.S. at 438, 88 S.Ct. 1689.

The very analysis for dissolving desegregation decrees supports continued maintenance of a desegregated system as a compelling state interest. The "good faith of the school board in complying with the decree" is, of course, a crucial component of the dissolution analysis. *Dowell*, 498 U.S. at 249, 111 S.Ct. 630. The school board's good faith is included in the analysis for only one reason—to predict the likelihood of future school board adherence to the principles that prompted the Decree in the first instance. Good faith was required in the use of race to remedy the former imbalances. If the Constitution somehow prohibits a school board from maintaining a desegregated school system, the good faith factor becomes something of a sham.

Like many other interests, this one is not categorically compelling. To use race to maintain a desegregated school system, there is a central distinction between vertical and horizontal distributions of resources:

> The Constitution is both color blind and color conscious. To avoid conflict with the equal protection clause, a classification that denies a benefit, causes harm, or imposes a burden must not be based on race. In that sense, the Constitution is color blind. But the Constitution is color conscious to prevent discrimination being perpetuated and to undo the effects of past discrimination.

*United States v. Jefferson County Bd. of Educ.*, 372 F.2d 836, 876 (5th Cir.1966); *see Wittmer*, 87 F.3d at 918 (applying "the skeptical, questioning, beady-eyed scrutiny," but only "when public officials use race to allocate burdens or benefits").

The workplace, marketplace, and higher education cases are poor models for most elementary and secondary public school education precisely because they always involve vertical choices—one person is hired, promoted, receives a valuable contract, or gains admission. Ordinarily, when JCPS assigns students to a particular elementary, middle, or high school, the assignment has no qualitative or "vertical" effects. This is so because the Court concludes that as between two regular elementary schools, assignment to one or another imposes no burden and confers no benefit. The same education is offered at each school, so assignment to one or another is basically fungible.[43] As a logical consequence, most courts have concluded that there is no individual right to attend a specific school in a district or to attend a neighborhood school. *See Wessmann*, 160 F.3d at 830 (Lipez, J., dissenting) (*citing Johnson*, 604 F.2d at 515; *United States v. Perry County Bd. of Educ.*, 567 F.2d 277, 279 (5th Cir.1978)). As among basically equal schools, the use of race would not be a "preference." As among basically equal schools, therefore, JCPS's policy is not one of "affirmative action." Under this analysis, JCPS would not be prohibited from using race in its general student assignments to maintain its desegregated school system, even to the extent of some racial guidelines. *See Johnson*, 604 F.2d at 518.

But Central High School differs significantly from these schools because it offers magnet programs that are not available at other high schools.[44] Therefore, racial

---

**43.** The Court understands that students and their parents might prefer one school over another. The preference may even arise from a perception that one school is better than others due to its location, its teachers and principal, or its classroom environment. However, these matters of personal preference do not distinguish those schools in a constitutionally significant sense.

**44.** The unspoken undercurrent of *Wessmann* was the specialness or particular desirability

classifications in student assignment at Central do have vertical effects: African–American students cannot enroll in the Central magnet programs on account of their race, and only Central offers those programs. When it decides who may attend Central, JCPS uses a racial classification that denies a benefit, causes a harm, and imposes a burden on unsuccessful African–American applicants. Even the Court's broader view of the schools' compelling interest will not sanction such a use of race at Central and other similar schools.

### C.

The Court has directed its attention to Central High School because it is the focus of this lawsuit. Because the attendant harm will be irreparable, JCPS must immediately stop using race to assign students in an unconstitutional manner to Central. JCPS may choose to pursue a genuine *Bakke*-type diversity plan, or it may stop using race at Central altogether, but Central's student assignment plan must be changed before the 2000–2001 school year. The Court will not specifically require that any Plaintiff be admitted to Central. The Board retains the right to assign students to any school on a non-discriminatory basis. However, any African–American student who applied to Central this year and was denied admission must now be offered enrollment.[45] No current Central student, black or white, should be asked to leave Central as a part of any new plan.

The evidence suggests that the student assignment plan applies similarly to other magnet schools, though its effects may be different. The same rule against hard racial quotas may apply directly to those schools. The Court is mindful of Judge Gordon's four principles for handling change in a large, metropolitan school system: stability, equity, predictability, and simplicity. In this particular instance, a stable transition from the Decree is critical. Because those other schools were not the focal concern of this lawsuit, a more gradual transition is appropriate. To allow such a transition period is within the equitable power of the Court where it serves the essential interests of preserving district-wide stability, as well as creating a fair and predictable plan for future applicants to certain magnet schools. Therefore, JCPS must complete any re-evaluation and redesign of the admission procedures in these magnet or special programs for the start of the 2002–2003 school year. The Court will set a hearing to determine the manner in which this Memorandum Opinion applies to other magnet schools.

Finally, as to JCPS's regular schools, the facts and arguments presented here compel no change. None of the Plaintiffs or Intervenors sought to end the use of race in assigning students to JCPS's regular elementary, middle, or high schools, so the issue is not actually before the Court. The Court's analysis of the Central admissions policies suggests that the use of race at non-magnet schools is permissible. Now that the desegregation Decree is dissolved, the Board is free to adopt whichever student assignment plan it deems fit, consistent with this Memorandum Opinion and the Equal Protection Clause.

of the Boston Latin School. There a panel of the First Circuit analyzed a "program which induces schools to grant preferences based on race and ethnicity." *Wessmann,* 160 F.3d at 794. Student assignment to generally equal schools, however, would not be a granting of preferences.

**45.** The Court has given much thought to whether such an immediate remedy is appropriate. After all, when the JCPS admitted students to Central for the 2000–2001 school year, it acted under the continuing Decree. Therefore, its actions did not violate the Equal Protection Clause. Nevertheless, in view of the length of this litigation and the fairly limited scope of this initial remedy, the Court concludes that admission of those students for the 2000–2001 school year is realistic and equitable.

The Court will enter an order consistent with this Memorandum Opinion.

## ORDER

Plaintiffs moved to dissolve the school desegregation decree originally imposed in *Haycraft v. Board of Educ. of Jefferson County,* Nos. 7045 & 7291 (W.D.Ky. July 30, 1975). Defendants and the Intervening Plaintiffs moved for a directed verdict in their favor. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that *Haycraft v. Board of Educ. of Jefferson County* is reopened, Plaintiffs' motion to dissolve its Continuing Decree is SUSTAINED, and that Decree is DISSOLVED.

IT IS FURTHER ORDERED that Defendants' and Intervenors' motions for a directed verdict are DENIED.

IT IS FURTHER ORDERED that prior to the beginning of the 2000–2001 school year, the Jefferson County Board of Education shall admit to Central High School any African–American students denied enrollment on account of their race for the year 2000–2001.

IT IS FURTHER ORDERED that prior to the beginning of the 2002–2003 school year, the Jefferson County Board of Education shall revise its admissions policies at its other magnet schools. The Court will set a hearing to determine the manner in which this Memorandum Opinion applies to other magnet schools.