Justice Thomas,
concurring.
Today, the Court holds that state entities may not experiment with race-based means to achieve ends they deem socially desirable. I wholly concur in The Chief Justice’s opinion. I write separately to address several of the contentions in Justice Breyer’s dissent (hereinafter dissent). Contrary to the dissent’s arguments, resegregation is not occurring in Seattle or Louisville; these school boards have no present interest in remedying past segregation; and these race-based student-assignment programs do not serve any compelling state interest. Accordingly, the plans are unconstitutional. Disfavoring a colorblind interpretation of the Constitution, the dissent would give school boards a free hand to make decisions on the basis of race — an approach reminiscent of that advocated by the segregationists in Brown v. Board of Education, 347 U. S. 483 (1954). This approach is just as wrong today as it was a half century ago. The Constitution and our cases require us to be much more demanding before permitting local school boards to make decisions based on race.
I
The dissent repeatedly claims that the school districts are threatened with resegregation and that they will succumb to that threat if these plans are declared unconstitutional. It also argues that these plans can be justified as part of the school boards’ attempts to “eradieatfe] earlier school segre *749 gation.” See, e. g., post, at 806. Contrary to the dissent’s rhetoric, neither of these school districts is threatened with resegregation, and neither is constitutionally compelled or permitted to undertake race-based remediation. Racial imbalance is not segregation, and the mere incantation of terms like resegregation and remediation cannot make up the difference.
A
Because this Court has authorized and required race-based remedial measures to address de jure segregation, it is important to define segregation clearly and to distinguish it from racial imbalance. In the context of public schooling, segregation is the deliberate operation of a school system to “carry out a governmental policy to separate pupils in schools solely on the basis of. race.” Swann v. CharlotteMecklenburg Bd. of Ed., 402 U. S. 1, 6 (1971); see also Monroe v. Board ofComm’rs of Jackson, 391 U. S. 450, 452 (1968). In Brown, this Court declared that segregation was unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. Swann, supra, at 6; see also Green v. School Bd. of New Kent Cty., 391 U. S. 430, 435 (1968) (“[T]he State, acting through the local school board and school officials, organized and operated a dual system, part ‘white’ and part ‘Negro.’ It was such dual systems that. 14 years ago Brown[, 347 U. S. 483,] held unconstitutional and a year later Brown [v. Board of Education, 349 U. S. 294 (1955),] held must be abolished”).[1]
Racial imbalance is the failure of a school district’s individual schools to match or approximate the demographic makeup of the student population at large. Cf. Washington *750 v. Seattle School Dist. No. 1, 458 U. S. 457, 460 (1982). Racial imbalance is not segregation.[2] Although presently observed racial imbalance might result from past de jure segregation, racial imbalance can also result from any number of innocent private decisions, including voluntary housing choices. See Swann, supra, at 25-26; Missouri v. Jenkins, 515 U. S. 70, 116 (1995) (Thomas, J., concurring). Because racial imbalance is not inevitably linked to unconstitutional segregation, it is not unconstitutional in and of itself. Dayton Bd. of Ed. v. Brinkman, 433 U. S. 406, 413 (1977); Dayton Bd. of Ed. v. Brinkman, 443 U. S. 526, 531, n. 5 (1979) (“Racial imbalance ... is not per se a constitutional violation”); Freeman v. Pitts, 503 U. S. 467, 494 (1992); see also Swann, supra, at 31-32; cf. Milliken v. Bradley, 418 U. S. 717, 740-741, and n. 19 (1974).
Although there is arguably a danger of racial imbalance in schools in Seattle and Louisville, there is no danger of resegregation. No one contends that Seattle has established or that Louisville has reestablished a dual school system that separates students on the basis of race. The statistics cited in Appendix A to the dissent are not to the contrary. See post, at 869-872. At most, those statistics show a national trend toward classroom racial imbalance. However, racial imbalance without intentional state action to separate the races does not amount to segregation. To raise the specter of resegregation to defend these programs is to ignore the meaning of the word and the nature of the cases before us.[3]
*751 B
Just as the school districts lack an interest in preventing resegregation, they also have no present interest in remedying past segregation. The Constitution generally prohibits government race-based decisionmaking, but this Court has authorized the use of race-based measures for remedial purposes in two narrowly defined circumstances. First, in schools that were formerly segregated by law, race-based measures are sometimes constitutionally compelled to remedy prior school segregation. Second, in Croson, the Court appeared willing to authorize a government unit to remedy past discrimination for which it was responsible. Richmond v. J. A. Croson Co., 488 U. S. 469, 504 (1989). Without explicitly resting on either of these strands of doctrine, the dissent repeatedly invokes the school districts’ supposed interests in remedying past segregation. Properly analyzed, though, these plans do not fall within either existing category of permissible race-based remediation.
1
The Constitution does not permit race-based government decisionmaking simply because a school district claims a remedial purpose and proceeds in good faith with arguably pure motives. Grutter v. Bollinger, 539 U. S. 306, 371 (2003) *752 (Thomas, J., concurring in part and dissenting in part) (citing Adarand Constructors, Inc. v. Peña, 515 U. S. 200, 239 (1995) (Scalia, J., concurring in part and concurring in judgment)). Rather, race-based government decisionmaking is categorically prohibited unless narrowly tailored to serve a compelling interest. Grutter, supra, at 326; see also Part II-A, infra. This exacting scrutiny “has proven automatically fatal” in most cases. Jenkins, supra, at 121 (Thomas, J., concurring); cf. Hirabayashi v. United States, 320 U. S. 81, 100 (1943) (“[Rjacial discriminations are in most circumstances irrelevant and therefore prohibited”). And appropriately so. “The Constitution abhors classifications based on race, not only because those classifications can harm favored races or are based on illegitimate motives, but also because every time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, it demeans us all.” Grutter, supra, at 353 (opinion of Thomas, J.). Therefore, as a general rule, all race-based government decisionmaking — regardless of context — is unconstitutional.
2
This Court has carved out a narrow exception to that general rule for cases in which a school district has a “history of maintaining two sets of schools in a single school system deliberately operated to carry out a governmental policy to separate pupils in schools solely on the basis of race.”[4] Swann, 402 U. S., at 5-6. In such cases, race-based reme *753 dial measures are sometimes required.[5] Green, 391 U. S., at 437-438; cf. United States v. Fordice, 505 U. S. 717, 745 (1992) (Thomas, J., concurring).[6] But without a history of state-enforced racial separation, a school district has no affirmative legal obligation to take race-based remedial measures to eliminate segregation and its vestiges.
Neither of the programs before us today is compelled as a remedial measure, and no one makes such a claim. Seattle has no history of de jure segregation; therefore, the Constitution did not require Seattle’s plan.[7] Although Louisville *754 once operated a segregated school system and was subject to a Federal District Court’s desegregation decree, see ante, at 715-716; Hampton v. Jefferson Cty. Bd. of Ed., 102 F. Supp. 2d 358, 376-377 (WD Ky. 2000), that decree was dissolved in 2000, id.,, at 360. Since then, no race-based remedial measures have been required in Louisville. Thus, the race-based student-assignment plan at issue here, which was instituted the year after the dissolution of the desegregation decree, was not even arguably required by the Constitution.
3
Aside from constitutionally compelled remediation in schools, this Court has permitted government units to remedy prior racial discrimination only in narrow circumstances. See Wygant v. Jackson Bd. of Ed., 476 U. S. 267, 277 (1986) (plurality opinion). Regardless of the constitutional validity of such remediation, see Croson, 488 U. S., at 524-525 (Scalia, J., concurring in judgment), it does not apply here. Again, neither school board asserts that its race-based actions were taken to remedy prior discrimination. Seattle provides three forward-looking — as opposed to remedial— justifications for its race-based assignment plan. Brief for Respondents in No. 05-908, pp. 24-34. Louisville asserts several similar forward-looking interests, Brief for Respondents in No. 05-915, pp. 24-29, and at oral argument, counsel for Louisville disavowed any claim that Louisville’s argument “depend[ed] in any way on the prior de jure segregation,” Tr. of Oral Arg. in No. 05-915, p. 38.
Furthermore, for a government unit to remedy past discrimination for which it was responsible, the Court has required it to demonstrate “a ‘strong basis in evidence for its conclusion that remedial action was necessary.’” Croson, *755 supra, at 500 (quoting Wygant, supra, at 277 (plurality opinion)). Establishing a “strong basis in evidence” requires proper findings regarding the extent of the government unit’s past racial discrimination. Croson, 488 U. S., at 504. The findings should “define the scope of any injury [and] the necessary remedy,” id., at 505, and must be more than “inherently unmeasurable claims of past wrongs,” id., at 506. Assertions of general societal discrimination are plainly insufficient. Id., at 499, 504; Wygant, supra, at 274 (plurality opinion); cf. Regents of Univ. of Cal. v. Bakke, 438 U. S. 265, 310 (1978) (opinion of Powell, J.). Neither school district has made any such specific findings. For Seattle, the dissent attempts to make up for this failing by adverting to allegations made in past complaints filed against the Seattle school district. However, allegations in complaints cannot substitute for specific findings of prior discrimination — even when those allegations lead to settlements with complaining parties. Cf. Croson, supra, at 505; Wygant, supra, at 279, n. 5 (plurality opinion). As for Louisville, its slate was cleared by the District Court’s 2000 dissolution decree, which effectively declared that there were no longer any effects of de jure discrimination in need of remediation.[8]
*756 Despite the dissent’s repeated intimation of a remedial purpose, neither of the programs in question qualifies as a permissible race-based remedial measure. Thus, the programs are subject to the general rule that government race-based decisionmaking is unconstitutional.
C
As the foregoing demonstrates, racial balancing is sometimes a constitutionally permissible remedy for the discrete legal wrong of de jure segregation, and when directed to that end, racial balancing is an exception to the general rule that government race-based decisionmaking is unconstitutional. Perhaps for this reason, the dissent conflates the concepts of segregation and racial imbalance: If racial imbalance equates to segregation, then it must also be constitutionally acceptable to use racial balancing to remedy racial imbalance.
For at least two reasons, however, it is wrong to place the remediation of segregation on the same plane as'the remediation of racial imbalance. First, as demonstrated above, the two concepts are distinct. Although racial imbalance can result from de jure segregation, it does not necessarily, and the further we get from the era of state-sponsored racial separation, the less likely it is that racial imbalance has a traceable connection to any prior segregation. See Freeman, 503 U. S., at 496; Jenkins, 515 U. S., at 118 (Thomas, J., concurring).
Second, a school cannot “remedy” racial imbalance in the same way that it can remedy segregation. Remediation of past de jure segregation is a one-time process involving the redress of a discrete legal injury inflicted by an identified entity. At some point, the discrete injury will be remedied, and the school district will be declared unitary. See Swann, 402 U. S., at 31. Unlike de jure segregation, there is no ultimate remedy for racial imbalance. Individual schools will fall in and out of balance in the natural course, and the appropriate balance itself will shift with a school district’s chang *757 ing demographies. Thus, racial balancing will have to take place on an indefinite basis — a continuous process with no identifiable culpable party and no discernable end point. In part for those reasons, the Court has never permitted outright racial balancing solely for the purpose of achieving a particular racial balance.
II
Lacking a cognizable interest in remediation, neither of these plans can survive strict scrutiny because neither plan serves a genuinely compelling state interest. The dissent avoids reaching that conclusion by unquestioningly accepting the assertions of selected social scientists while completely ignoring the fact that those assertions are the subject of fervent debate. Ultimately, the dissent’s entire analysis is corrupted by the considerations that lead it initially to question whether strict scrutiny should apply at all. What emerges is a version of “strict scrutiny” that combines hollow assurances of harmlessness with reflexive acceptance of conventional wisdom. When it comes to government race-based decisionmaking, the Constitution demands more.
A
The dissent claims that “the law requires application here of a standard of review that is not ‘strict’ , in the traditional sense of that word.” Post, at 837. This view is informed by dissents in our previous cases and the concurrences of two Court of Appeals judges. Post, at 835-836 (citing 426 F. 3d 1162, 1193-1194 (CA9 2005) (Kozinski, J., concurring); Comfort v. Lynn School Comm., 418 F. 3d 1, 28-29 (CA1 2005) (Boudin, C. J., concurring)). Those lower court judges reasoned that programs like these are not “aimed at oppressing blacks” and do not “seek to give one racial group an edge over another.” Id., at 27; 426 F. 3d, at 1193 (Kozinski, J., concurring). They were further persuaded that these plans differed from other race-based programs this Court has considered because they are “certainly more benign than laws *758 that favor or disfavor one race, segregate by race, or create quotas for or against a racial group,” Comfort, 418 F. 3d, at 28 (Boudin, C. J., concurring), and they are “far from the original evils at which the Fourteenth Amendment was addressed,” id., at 29; 426 F. 3d, at 1195 (Kozinski, J., concurring). Instead of strict scrutiny, Judge Kozinski would have analyzed the plans under “robust and realistic rational basis review.” Id., at 1194.
These arguments are inimical to the Constitution and to this Court’s precedents.[9] We have made it unusually clear that strict scrutiny applies to every racial classification. Adarand, 515 U. S., at 227; Grutter, 539 U. S., at 326; Johnson v. California, 543 U. S. 499, 505 (2005) (“We have insisted on strict scrutiny in every context, even for so-called ‘benign’ racial classifications”).[10] There are good reasons not to apply a lesser standard to these cases. The constitutional problems with government race-based decisionmaking are not diminished in the slightest by the presence or absence of an intent to oppress any race or by the real or asserted well-meaning motives for the race-based decision-making. Adarand, 515 U. S., at 228-229. Purportedly benign race-based decisionmaking suffers the same constitutional infirmity as invidious race-based decisionmaking. *759 Id., at 240 (Thomas, J., concurring in part and concurring in judgment) (“As far as the Constitution is concerned, it is irrelevant whether a government’s racial classifications are drawn by those who wish to oppress a race or by those who have a sincere desire to help those thought to be disadvantaged”).
Even supposing it mattered to the constitutional analysis, the race-based student-assignment programs before us are not as benign as the dissent believes. See post, at 834-835. “[R]aeial paternalism and its unintended consequences can be as poisonous and pernicious as any other form of discrimination.” Adarand, supra, at 241 (opinion of Thomas, J.). As these programs demonstrate, every time the government uses racial criteria to “bring the races together,” post, at 829, someone gets excluded, and the person excluded suffers an injury solely because of his or her race. The petitioner in the Louisville case received a letter from the school board informing her that her kindergartner would not be allowed to attend the school of petitioner’s choosing because of the child’s race. App. in No. 05-915, p. 97. Doubtless, hundreds of letters like this went out from both school boards every year these race-based assignment plans were in operation. This type of exclusion, solely on the basis of race,' is precisely the sort of government action that pits the races against one another, exacerbates racial tension, and “provoke[s] resentment among those who believe that they have been wronged by the government’s use of race.” Adarand, supra, at 241 (opinion of Thomas, J.). Accordingly, these plans are simply one more variation on the government race-based decisionmaking we have consistently held must be subjected to strict scrutiny. Grutter, supra, at 326.
B
Though the dissent admits to discomfort in applying strict scrutiny to these plans, it claims to have nonetheless applied that exacting standard. But in its search for a compelling *760 interest, the dissent casually accepts even the most tenuous interests asserted on behalf of the plans, grouping them all under the term “ ‘integration.’ ” See post, at 838. “ ‘[Integration,’ ” we are told, has “three essential elements.” Ibid. None of these elements is compelling. And the combination of the three unsubstantiated elements does not produce an interest any more compelling than that represented by each element independently.
1
According to the dissent, integration involves “an interest in setting right the consequences of prior conditions of segregation.” Ibid. For the reasons explained above, the records in these cases do not demonstrate that either school board’s plan is supported by an interest in remedying past discrimination. Part I-B, supra.
Moreover, the school boards have no interest in remedying the sundry consequences of prior segregation unrelated to schooling, such as “housing patterns, employment practices, economic conditions, and social attitudes.” Post, at 838. General claims that past school segregation affected such varied societal trends are “too amorphous a basis for imposing a racially classified remedy,” Wygant, 476 U. S., at 276 (plurality opinion), because “[i]t is sheer speculation” how decades-past segregation in the school system might have affected these trends, see Croson, 488 U. S., at 499. Consequently, school boards seeking to remedy those societal problems with race-based measures in schools today would have no way to gauge the proper scope of the remedy. Id., at 498. Indeed, remedial measures geared toward such broad and unrelated societal ills have “‘no logical stopping point,’” ibid., and threaten to become “ageless in their reach into the past, and timeless in their ability to affect the future,” Wygant, supra, at 276 (plurality opinion). See Grutter, supra, at 342 (stating the “requirement that all governmental use of race must have a logical end point”).
*761 Because the school boards lack any further interest in remedying segregation, this element offers no support for the purported interest in “integration.”
2
Next, the dissent argues that the interest in integration has an educational element. The dissent asserts that racially balanced schools improve educational outcomes for black children. In support, the dissent unquestioningly cites certain social science research to support propositions that are hotly disputed among social scientists. In reality, it is far from apparent that coerced racial mixing has any educational benefits, much less that integration is necessary to black achievement.
Scholars have differing opinions as to whether educational benefits arise from racial balancing. Some have concluded that black students receive genuine educational benefits. See, e. g., Crain & Mahard, Desegregation and Black Achievement: A Review of the Research, 42 Law & Contemp. Prob. 17, 48 (Summer 1978). Others have been more circumspect. See, e. g., Henderson, Greenberg, Schneider, Uribe, & Verdugo, High-Quality Schooling for African American Students, in Beyond Desegregation 162,166 (M. Shujaa ed. 1996) (“Perhaps desegregation does not have a single effect, positive or negative, on the academic achievement of African American students, but rather some strategies help, some hurt, and still others make no difference whatsoever. It is clear to us that focusing simply on demographic issues detracts from focusing on improving schools”). And some have concluded that there are no demonstrable educational benefits. See, e.g., Armor & Rossell, Desegregation and Resegregation in the Public Schools, in Beyond the Color Line: New Perspectives on Race and Ethnicity in America 219, 239, 251 (A. Thernstrom & S. Thernstrom eds. 2002).
The amicus briefs in the cases before us mirror this divergence of opinion. Supporting the school boards, one amicus *762 has assured us that “both early desegregation research and recent statistical and econometric analyses . .. indicate that there are positive effects on minority student achievement scores arising from diverse school settings.” Brief for American Educational Research Association 10. Another brief claims that “school desegregation has a modest positive impact on the achievement of African-American students.” App. to Brief for 553 Social Scientists as Amici Curiae 13-14 (footnote omitted). Yet neither of those briefs contains specific details like the magnitude of the claimed positive effects or the precise demographic mix at which those positive effects begin to be realized. Indeed, the social scientists’ brief rather cautiously claims the existence of any benefit at all, describing the “positive impact” as “modest,” id., at 13, acknowledging that “there appears to be little or no effect on math scores,” id., at 14, and admitting that the “underlying reasons for these gains in achievement are not entirely clear,” id., at 15.[11]
Other amici dispute these findings. One amicus reports that “[i]n study after study, racial composition of a student body, when isolated, proves to be an insignificant determinant of student achievement.” Brief for Dr. John Murphy et al. in No. 05-908, p. 8; see also id., at 9 (“[TJhere is no evidence that diversity in the K-12 classroom positively af *763 fects student achievement”). Another amicus surveys several social science studies and concludes that “a fair and comprehensive analysis of the research shows that there is no clear and consistent evidence of [educational] benefits.” Brief for David J. Armor et al. 29.
Add to the inconclusive social science the fact of black achievement in “racially isolated” environments. See T. Sowell, Education: Assumptions Versus History 7-38 (1986). Before Brown, the most prominent example of an exemplary black school was Dunbar High School. Sowell, Education: Assumptions Versus History, at 29 (“[X]n the period 1918-1923, Dunbar graduates earned fifteen degrees from Ivy League colleges, and ten degrees from Amherst, Williams, and Wesleyan”). Dunbar is by no means an isolated example. See id., at 10-32 (discussing other successful black schools); Walker, Can Institutions Care? Evidence from the Segregated Schooling of African American Children, in Beyond Desegregation, supra, at 209-226; see also T. Sowell, Affirmative Action Around the World: An Empirical Study 141-165 (2004). Even after Brown, some schools with predominantly black enrollments have achieved outstanding educational results. See, e. g., S. Carter, No Excuses: Lessons from 21 High-Performing, High-Poverty Schools 49-50, 53-56, 71-73, 81-84, 87-88 (2001); A. Thernstrom & S. Thernstrom, No Excuses: Closing the Racial Gap in Learning 43-64 (2003); see also L. Izumi, They Have Overcome: High-Poverty, High-Performing Schools in California (2002) (chronicling exemplary achievement in predominantly Hispanic schools in California). There is also evidence that black students attending historically black colleges achieve better academic results than those attending predominantly white colleges. Grutter, 539 U. S., at 364-365 (Thomas, J., concurring in part and dissenting in part) (citing sources); see also Fordice, 505 U. S., at 748-749 (Thomas, J., concurring).
*764 The Seattle School Board itself must believe that racial mixing is not necessary to black achievement. Seattle operates a K-8 “African-American Academy,” which has a “nonwhite” enrollment of 99%. See App. in No. 05-908, p. 227a; Reply Brief for Petitioner in No. 05-908, p. 13, n. 13. That school was founded in 1990 as part of the school board’s effort to “increase academic achievement.”[12] See African American Academy History, online at http.7/www.seattlesehools. org/schools/aaa/history.htm (all Internet materials as visited June 26, 2007, and available in Clerk of Court’s case file). According to the school’s most recent annual report, “[a]cademic excellence” is its “primary goal.” See African American Academy 2006 Annual Report, p. 2, online at http://www.seattleschools.org/area/siso/reports/anrep/altern/ 938.pdf. This racially imbalanced environment has reportedly produced test scores “higher across all grade levels in reading, writing and math.” Ibid. Contrary to what the dissent would have predicted, see post, at 839-840, the children in Seattle’s African American Academy have shown gains when placed in a “highly segregated” environment.
Given this tenuous relationship between forced racial mixing and improved educational results for black children, the dissent cannot plausibly maintain that an educational element supports the integration interest, let alone makes it compelling.[13] See Jenkins, 515 U. S., at 121-122 (Thomas, *765 J., concurring) (“[T]here is no reason to think that black students cannot learn as well when surrounded by members of their own race as when they are in an integrated environment”).
Perhaps recognizing as much, the dissent argues that the social science evidence is “strong enough to permit a democratically elected school board reasonably to determine that this interest is a compelling one.” Post, at 839. This assertion is inexplicable. It is not up to the school boards — the very government entities whose race-based practices we must strictly scrutinize — to determine what interests qualify as compelling under the Fourteenth Amendment to the United States Constitution. Rather, this Court must assess independently the nature of the interest asserted and the evidence to support it in order to determine whether it qualifies as compelling under our precedents. In making such a determination, we have deferred to state authorities only once, see Grutter, 539 U. S., at 328-330, and that deference was prompted by factors uniquely relevant to higher education. Id., at 328 (“Our holding today is in keeping with our tradition of giving a degree of deference to a university’s academic decisions”). The dissent’s proposed test — whether sufficient social science evidence supports a government unit’s conclusion that the interest it asserts is compelling— calls to mind the rational-basis standard of review the dissent purports not to apply, post, at 836-837. See Williamson v. Lee Optical of Okla., Inc., 348 U. S. 483, 488 (1955) (“It is enough that there is an evil at hand for correc *766 tion, and that it might be thought that the particular legislative measure was a rational way to correct it”). Furthermore, it would leave our equal protection jurisprudence at the mercy of elected government officials evaluating the evanescent views of a handful of social scientists. To adopt the dissent’s deferential approach would be to abdicate our constitutional responsibilities.[14]
3
Finally, the dissent asserts a “democratic element” to the integration interest. It defines the “democratic element” as “an interest in producing an educational environment that reflects the ‘pluralistic society’ in which our children will live.” Post, at 840.[15] Environmental reflection, though, is *767 just another way to say racial balancing. And “[preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake.” Bakke, 438 U. S., at 307 (opinion of Powell, J.). “This the Constitution forbids.” Ibid.; Grutter, supra, at 329-330; Freeman, 503 U. S., at 494.
Navigating around that inconvenient authority, the dissent argues that the racial balancing in these plans is not an end in itself but is instead intended to “teac[h] children to engage in the kind of cooperation among Americans of all races that is necessary to make a land of 300 million people one Nation.” Post, at 840. These “generic lessons in socialization and good citizenship” are too sweeping to qualify as compelling interests. Grutter, 539 U. S., at 348 (Scalia, J., concurring in part and dissenting in part). And they are not “uniquely relevant” to schools or “uniquely ‘teachable’ in a formal educational setting.” Id., at 347. Therefore, if governments may constitutionally use racial balancing to achieve these aspirational ends in schools, they may use racial balancing to achieve similar goals at every level—from state-sponsored 4-H clubs, see Bazemore v. Friday, 478 U. S. 385, 388-390 (1986) (Brennan, J., concurring in part), to the state civil service, see Grutter, 539 U. S., at 347-348 (opinion of Scalia, J.).
Moreover, the democratic interest has no durational limit, contrary to Grutter’s command. See id., at 342 (opinion of the Court); see also Croson, 488 U. S., at 498; Wygant, 476 U. S., at 275 (plurality opinion). In other words, it will always be important for students to learn cooperation among the races. If this interest justifies race-conscious measures today, then logically it will justify race-conscious measures forever. Thus, the democratic interest, limitless in scope *768 and “timeless in [its] ability to affect the future,” id., at 276, cannot justify government race-based decisionmaking.[16]
In addition to these defects, the democratic element of the integration interest fails on the dissent’s own terms. The dissent again relies upon social science research to support the proposition that state-compelled racial mixing teaches children to accept cooperation and improves racial attitudes and race relations. Here again, though, the dissent overstates the data that supposedly support the interest.
The dissent points to data that indicate that “black and white students in desegregated schools are less racially prejudiced than those in segregated schools.” Post, at 841 (internal quotation marks omitted). By the dissent’s account, improvements in racial attitudes depend upon the increased contact between black and white students thought to occur in more racially balanced schools. There is no guarantee, however, that students of different races in the same school will actually spend time with one another. Schools frequently group students by academic ability as an aid to efficient instruction, but such groupings often result in classrooms with high concentrations of one race or another. See, *769 e. g., Yonezawa, Wells, & Serna, Choosing Tracks: “Freedom of Choice” in Detracking Schools, 39 Am. Ed. Research J. 37, 38 (2002); Miekelson, Subverting Swann: First- and Second-Generation Segregation in the Charlotte-Mecklenburg Schools, 38 Am. Ed. Research J. 215, 233-234 (2001) (describing this effect in schools in Charlotte, North Carolina). In addition to classroom separation, students of different races within the same school may separate themselves socially. See Hallinan & Williams, Interracial Friendship Choices in Secondary Schools, 54 Am. Sociological Rev. 67, 72-76 (1989); see also Clotfelter, Interracial Contact in High School Extracurricular Activities, 34 Urban Rev. 25, 41-43 (2002). Therefore, even supposing interracial contact leads directly to improvements in racial attitudes and race relations, a program that assigns students of different races to the same schools might not capture those benefits. Simply putting students together under the same roof does not necessarily mean that the students will learn together or even interact.
Furthermore, it is unclear whether increased interracial contact improves racial attitudes and relations.[17] One researcher has stated that “the reviews of desegregation and intergroup relations were unable to come to any conclusion about what the probable effects of desegregation were ...[;] *770 virtually all of the reviewers determined that few, if any, firm conclusions about the impact of desegregation on inter-group relations could be drawn.” Schofield, School Desegregation and Intergroup Relations: A Review of the Literature, in 17 Review of Research in Education 335, 356 (G. Grant ed. 1991). Some studies have even found that a deterioration in racial attitudes seems to result from racial mixing in schools. See N. St. John, School Desegregation Outcomes for Children 67-68 (1975) (“A giance at [the data] shows that for either race positive findings are less common than negative findings”); Stephan, The Effects of School Desegregation: An Evaluation 30 Years After Brown, in 3 Advances in Applied Social Psychology 181, 183-186 (M. Saks & L. Saxe eds. 1986). Therefore, it is not nearly as apparent as the dissent suggests that increased interracial exposure automatically leads to improved racial attitudes or race relations.
Given our case law and the paucity of evidence supporting the dissent’s belief that these plans improve race relations, no democratic element can support the integration interest.[18]
4
The dissent attempts to buttress the integration interest by claiming that it follows a fortiori from the interest this Court recognized as compelling in Grutter. Post, at 841-842. Regardless of the merit of Grutter, the compelling interest recognized in that case cannot support these plans. Grutter recognized a compelling interest in a law school’s attainment of a diverse student body. 539 U. S., at *771 328. This interest was critically dependent upon features unique to higher education: “the expansive freedoms of speech and thought associated with the university environment,” the “special niche in our constitutional tradition” occupied by universities, and “[t]he freedom of a university to make its own judgments as to education[,] including] the selection of its student body.” Id., at 329 (internal quotation marks omitted). None of these features is present in elementary and secondary schools. Those schools do not select their own students, and education in the elementary and secondary environment generally does not involve the free interchange of ideas thought to be an integral part of higher education. See 426 F. 3d, at 1208 (Bea, J., dissenting). Extending Grutter to this context would require us to cut that holding loose from its theoretical moorings. Thus, only by ignoring Grutter’s reasoning can the dissent claim that recognizing a compelling interest in these cases is an a fortiori application of Grutter.
C
Stripped of the baseless and novel interests the dissent asserts on their behalf, the school boards cannot plausibly maintain that their plans further a compelling interest. As I explained in Grutter, only “those measures the State must take to provide a bulwark against anarchy ... or to prevent violence” and “a government’s effort to remedy past discrimination for which it is responsible” constitute compelling interests. 539 U. S., at 353, 351-352 (opinion concurring in part and dissenting in part). Neither of the parties has argued — nor could they — that race-based student assignment is necessary to provide a bulwark against anarchy or to prevent violence. And as I explained above, the school districts have no remedial interest in pursuing these programs. See Part I-B, supra. Accordingly, the school boards cannot satisfy strict scrutiny. These plans are unconstitutional.
*772 III
Most of the dissent’s criticisms of today’s result can be traced to its rejection of the colorblind Constitution. See post, at 830. The dissent attempts to marginalize the notion of a colorblind Constitution by consigning it to me and Members of today’s plurality.[19] See ibid.; see also post, at 862-863. But I am quite comfortable in the company I keep. My view of the Constitution is Justice Harlan’s view in Plessy: “Our Constitution is color-blind, and neither knows nor tolerates classes among citizens.” Plessy v. Ferguson, 163 U. S. 537, 559 (1896) (dissenting opinion). And my view was the rallying cry for the lawyers who litigated Brown. See, e. g., Brief for Appellants in Nos. 1, 2, and 4 and for Respondents in No. 10 on Reargument in Brown v. Board of Education, O. T. 1953, p. 65 (“That the Constitution is color blind is our dedicated belief”); Brief for Appellants in Brown v. Board of Education, O. T. 1952, No. 8, p. 5 (“The Fourteenth Amendment precludes a state from imposing distinctions or classifications based upon race and color alone”);[20] *773 see also In Memoriam: Honorable Thurgood Marshall, Proceedings of the Bar and Officers of the Supreme Court of the United States, p. X (1993) (remarks of Judge Motley) (“Marshall had a ‘Bible’ to which he turned during his most depressed moments. The ‘Bible’ would be known in the legal community as the first Mr. Justice Harlan’s dissent in Plessy v. Ferguson, 163 U. S. 537, 552 (1896). I do not know of any opinion which buoyed Marshall more in his pre-Brotow days ... ”).
The dissent appears to pin its interpretation of the Equal Protection Clause to current societal practice and expectations, deference to local officials, likely practical consequences, and reliance on previous statements from this and other courts. Such a view was ascendant in this Court’s jurisprudence for several decades. It first appeared in Plessy, where the Court asked whether a state law providing for segregated railway cars was “a reasonable regulation.” 163 U. S., at 550. The Court deferred to local authorities in making its determination, noting that in inquiring into reasonableness “there must necessarily be a large discretion on the part of the legislature.” Ibid. The Court likewise paid heed to societal practices, local expectations, and practical consequences by looking to “the established usages, customs and traditions of the people, and with a view to the promotion of their comfort, and the preservation of the public peace and good order.” Ibid. Guided by these principles, the Court concluded: “[W]e cannot say that a law which authorizes or even requires the separation of the two races in public conveyances is unreasonable, or more obnoxious to the Fourteenth Amendment than the acts of Congress requiring separate schools for colored children in the District of Columbia.” Id., at 550-551.
The segregationists in Brown embraced the arguments the Court endorsed in Plessy. Though Brown decisively re *774 jected those arguments, today’s dissent replicates them to a distressing extent. Thus, the dissent argues that “[e]ach plan embodies the results of local experience and community consultation.” Post, at 848. Similarly, the segregationists made repeated appeals to societal practice and expectation. See, e. g., Brief for Appellees on Reargument in Briggs v. Elliott, O. T. 1953, No. 2, p. 76 (“[A] State has power to establish a school system which is capable of efficient administration, taking into account local problems and conditions”).[21] The dissent argues that “weight [must be given] to a local school board’s knowledge, expertise, and concerns,” post, at 848, and with equal vigor, the segregationists argued for def *775 erence to local authorities. See, e. g., Brief for Kansas on Reargument in Brown v. Board of Education, O. T. 1953, No. 1, p. 14 (“We advocate only a concept of constitutional law that permits determinations of state and local policy to be made on state and local levels. We defend only the validity of the statute that enables the Topeka Board of Education to determine its own course”).[22] The dissent argues that today’s decision “threatens to substitute for present calm a disruptive round of race-related litigation,” post, at 803, and claims that today’s decision “risks serious harm to the law and for the Nation,” post, at 865. The segregationists also relied upon the likely practical consequences of ending the state-imposed system of racial separation. See, e. g., Brief *776 for Appellees on Reargument in Davis v. County School Board, O. T. 1953, No. 4, p. 37 (“Yet a holding that school segregation by race violates the Constitution will result in upheaval in all of those places not now subject to Federal judicial scrutiny. This Court has made many decisions of widespread effect; none would affect more people more directly in more fundamental interests and, in fact, cause more chaos in local government than a reversal of the decision in this case”).[23] And foreshadowing today’s dissent, the segregationists most heavily relied upon judicial precedent. See, e. g., Brief for Appellees on Reargument in Briggs v. Elliott, O. T. 1953, No. 2, at 59 (“[I]t would be difficult indeed to find a case so favored by precedent as is the case for South Carolina here”).[24]
*777 The similarities between the dissent’s arguments and the segregationists’ arguments do not stop there. Like the dissent, the segregationists repeatedly cautioned the Court to consider practicalities and not to embrace too theoretical a view of the Fourteenth Amendment.[25] And just as the dis *778 sent argues that the need for these programs will lessen over time, the segregationists claimed that reliance on segregation was lessening and might eventually end.[26]
What was wrong in 1954 cannot be right today.[27] Whatever else the Court’s rejection of the segregationists’ argu *779 ments in Brown might have established, it certainly made clear that state and local governments cannot take from the Constitution a right to make decisions on the basis of race by adverse possession. The fact that state and local governments had been discriminating on the basis of race for a long time was irrelevant to the Brown Court. The fact that racial discrimination was preferable to the relevant communities was irrelevant to the Brown Court. And the fact that the state and local governments had relied on statements in this Court’s opinions was irrelevant to the Brown Court. The same principles guide today’s decision. None of the considerations trumpeted by the dissent is relevant to the constitutionality of the school boards’ race-based plans because no contextual detail — or collection of contextual details, post, at 804-823 — can “provide refuge from the principle that under our Constitution, the government may not make distinctions on the basis of race.” Adarand, 515 U. S., at 240 (Thomas, J., concurring in part and concurring in judgment).[28]
*780 In place of the colorblind Constitution, the dissent would permit measures to keep the races together and proscribe measures to keep the races apart.[29] See post, at 829-835, 865. Although no such distinction is apparent in the Fourteenth Amendment, the dissent would constitutionalize today’s faddish social theories that embrace that distinction. The Constitution is not that malleable. Even if current social theories favor classroom racial engineering as necessary to “solve the problems at hand,” post, at 822, the Constitution enshrines principles independent of social theories. See Plessy, 163 U. S., at 559 (Harlan, J., dissenting) (“The white race deems itself to be the dominant race in this country. And so it is, in prestige, in achievements, in education, in wealth and in power. So, I doubt not, it will continue to be for all time .... But in view of the Constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. . . . Our Constitution is color-blind, and neither knows nor tolerates classes among citizens”). Indeed, if our history has taught us anything, it has taught *781 us to beware of elites bearing racial theories.[30] See, e. g., Dred Scott v. Sandford, 19 How. 393, 406, 407 (1857) (“[T]hey [members of the “negro African race”] had no rights which the white man was bound to respect”). Can we really be sure that the racial theories that motivated Dred Scott and Plessy are a relic of the past or that future theories will be *782 nothing but beneficent and progressive? That is a gamble I am unwilling to take, and it is one the Constitution does not allow.
* * *
The plans before us base school assignment decisions on students’ race. Because “[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens,” such race-based decisionmaking is unconstitutional. Plessy, supra, at 559 (Harlan, J., dissenting). I concur in The Chief Justice’s opinion so holding.

 In this Court’s paradigmatic segregation cases, there was a local ordinance, state statute, or state constitutional provision requiring racial separation. See, e. g., Brief for Petitioners in Bolling v. Sharpe, O. T. 1952, No. 413, pp. 28-30 (cataloging state laws requiring separation of the races); id., at App. A (listing “Statutory and Constitutional Provisions in the States Where Segregation in Education is Institutionalized”).

 The dissent refers repeatedly and reverently to “ ‘integration.’ ” However, outside of the context of remediation for past de jure segregation, “integration” is simply racial balancing. See post, at 838. Therefore, the school districts’ attempts to further “integrate” are properly thought of as little more than attempts to achieve a particular racial balance.

 The dissent’s assertion that these plans are necessary for the school districts to maintain their “hard-won gains” reveals its conflation of segregation and racial imbalance. Ibid. For the dissent’s purposes, the relevant hard-won gains are the present racial compositions in the individ *751 ual schools in Seattle and Louisville. However, the actual hard-won gain in these cases is the elimination of the vestiges of the system of state-enforced racial separation that once existed in Louisville. To equate the achievement of a certain statistical mix in several schools with the elimination of the system of systematic de jure segregation trivializes the latter accomplishment. Nothing but an interest in classroom aesthetics and a hypersensitivity to elite sensibilities justifies the school districts’ racial balancing programs. See Part II-B, infra. But “the principle of inherent equality that underlies and infuses our Constitution” required the disestablishment of de jure segregation. See Adarand Constructors, Inc. v. Peña, 515 U. S. 200, 240 (1995) (Thomas, J., concurring in part and concurring in judgment). Assessed in any objective manner, there is no comparison between the two.

 The dissent makes much of the supposed difficulty of determining whether prior segregation was de jure or de facto. See, e. g., post, at 820-821. That determination typically will not be nearly as difficult as the dissent makes it seem. In most cases, there either will or will not have been a state constitutional amendment, state statute, local ordinance, or local administrative policy explicitly requiring separation of the races. See, e:g., n. 1, supra. And even if the determination is difficult, it is one the dissent acknowledges must be made to determine what remedies school districts are required to adopt. Post, at 843-844.

 This Court’s opinion in McDaniel v. Barresi, 402 U. S. 39 (1971), fits comfortably within this framework. There, a Georgia school board voluntarily adopted a desegregation plan. At the time of Brown v. Board of Education, 347 U. S. 483 (1954), Georgia’s Constitution required that “[s]eparate schools shall be provided for the white and colored races.” Ga. Const., Art. VIII, §2-6401 (1945). Given that state law had previously required the school board to maintain a dual school system, the county was obligated to take measures to remedy its prior de jure segregation. This Court recognized as much in its opinion, which stated that the school board had an “affirmative duty to disestablish the dual school system.” McDaniel, supra, at 41.

 As I have explained elsewhere, the remedies this Court authorized lower courts to compel in early desegregation cases like Green and Swann were exceptional. See Missouri v. Jenkins, 515 U. S. 70, 124-125 (1995) (concurring opinion). Sustained resistance to Brown prompted the Court to authorize extraordinary race-conscious remedial measures (like compelled racial mixing) to turn the Constitution’s dictate to desegregate into reality. 515 U. S., at 125 (Thomas, J., concurring). Even if these measures were appropriate as remedies in the face of widespread resistance to Brown’s mandate, they are not forever insulated from constitutional scrutiny. Rather, “such powers should have been temporary and used only to overcome the widespread resistance to the dictates of the Constitution.” 515 U. S., at 125 (Thomas, J., concurring).

 Though the dissent cites every manner of complaint, record material, and scholarly article relating to Seattle’s race-based student-assignment efforts, post, at 873-875, it cites no law or official policy that required separation of the races in Seattle’s schools. Nevertheless, the dissent tries to east doubt on the historical fact that the Seattle schools were never segregated by law by dting allegations that the National Association for the Advancement of Colored People and other organizations made *754 in court filings to the effect that Seattle’s schools were once segregated by law. See post, at 808-810, 824. These allegations were never proved and were not even made in this case. Indeed, the record before us suggests the contrary. See App. in No. 05-908, pp. 214a, 225a, 257a. Past allegations in another case provide no basis for resolving these cases.

 Contrary to the dissent’s argument, post, at 844-845, the Louisville school district’s interest in remedying its past de jure segregation did vanish the day the District Court found that Louisville had eliminated the vestiges of its historic de jure segregation. See Hampton v. Jefferson Cty. Bd. of Ed., 102 F. Supp. 2d 358, 360 (WD Ky. 2000). If there were further remediation to be done, the District Court could not logically have reached the conclusion that Louisville “ha[d] eliminated the vestiges associated with the former policy of segregation and its pernicious effects.” Ibid. Because Louisville could use race-based measures only as a remedy for past de jure segregation, it is not "incoherent,” post, at 856, to say that race-based decisionmaking was allowed to Louisville one day — while it was still remedying — and forbidden to it the next — when remediation was finished. That seemingly odd turnaround is merely a result of the fact that the remediation of de jure segregation is a jealously guarded exception to the Equal Protection Clause’s general rule against government race-based decisionmaking.

 The dissent’s appeal to stare decisis, post, at 866, is particularly ironic in light of its apparent willingness to depart from these precedents, post, at 837.

 The idea that government racial classifications must be subjected to strict scrutiny did not originate in Adarand. As early as Loving v. Virginia, 388 U. S. 1 (1967), this Court made clear that government action that “rest[s] solely upon distinctions drawn according to race” had to be “subjected to the ‘most rigid scrutiny.’ ” Id., at 11 (quoting Korematsu v. United States, 323 U. S. 214, 216 (1944)); see also McLaughlin v. Florida, 379 U. S. 184, 196 (1964) (requiring a statute drawing a racial classification to be “necessary, and not merely rationally related, to the accomplishment of a permissible state policy”); id., at 197 (Harlan, J., concurring) (“The necessity test . . . should be equally applicable in a case involving state racial discrimination”).

 At least one of the academic articles the dissent cites to support this proposition fails to establish a causal connection between the supposed educational gains realized by black students and racial mixing. See Hallinan, Diversity Effects on Student Outcomes: Social Science Evidence, 59 Ohio St. L. J. 733 (1998). In the pages following the ones the dissent cites, the author of that article remarks that “the main reason white and minority students perform better academically in majority white schools is likely that these schools provide greater opportunities to learn. In other words, it is not desegregation per se that improves achievement, but rather the learning advantages some desegregated schools provide.” Id., at 744. Evidence that race is a good proxy for other factors that might be correlated with educational benefits does not support a compelling interest in the use of race to achieve academic results.

 Of course, if the Seattle School Board were truly committed to the notion that diversity leads directly to educational benefits, operating a school with such a high “nonwhite” enrollment would be a shocking dereliction of its duty to educate the students enrolled in that school.

 In fact, the available data from the Seattle school district appear to undercut the dissent’s view. A comparison of the test results of the schools in the last year the racial balancing program operated to the results in the 2004-to-2005 school year (in which student assignments were race neutral) does not indicate the decline in black achievement one would expect to find if black achievement were contingent upon a particular racial mix. See Washington State Report Card, online at http://report card.osplkl2.waus/summaryaspx ? schoolId=1099&OrgType=4&reportLevel *765 =School; http://reporteard.ospi.kl2.wa.us/summary.aspx?schoolld=1104& reportLevel=School&orgLinkId=1104&yrs=; http://reportrard.ospi.kl2.wa.us/ summary. aspx?schoolId=1061&reportLevel=School&orgLinkId=1061&yrs=; http://reportrard.ospi.kl2.wa.us/summary.aspx?sehoolId=1043&reportLevel =School&orgLinkId=1043&yrs= (showing that reading scores went up, not down, when Seattle’s race-based assignment program ended at Sealth High School, Ingraham High School, Garfield High School, and Franklin High School — some of the schools most affected by the plan).

 The dissent accuses me of “feel[ing] confident that, to end invidious discrimination, one must end all governmental use of race-conscious criteria” and chastises me for not deferring to democratically elected majorities. See post, at 862. Regardless of what Justice Breyer’s goals might be, this Court does not sit to “create a society that includes all Americans” or to solve the problems of “troubled inner-city schooling.” Ibid. We are not social engineers. The United States Constitution dictates that local governments cannot make decisions on the basis of race. Consequently, regardless of the perceived negative effects of racial imbalance, I will not defer to legislative majorities where the Constitution forbids it.
It should escape no one that behind Justice Breyer’s veil of judicial modesty hides an inflated role for the Federal Judiciary. The dissent’s approach confers on judges the power to say what sorts of discrimination are benign and which are invidious. Having made that determination (based on no objective measure that I can detect), a judge following the dissent’s approach will set the level of scrutiny to achieve the desired result. Only then must the judge defer to a democratic majority. In my view, to defer to one’s preferred result is not to defer at all.

 The notion that a “democratic” interest qualifies as a compelling interest (or constitutes a part of a compelling interest) is proposed for the first time in today’s dissent and has little basis in the Constitution or our precedent, which has narrowly restricted the interests that qualify as compelling. See Grntter v. Bollinger, 539 U. S. 306, 351-354 (2003) (Thomas, J., concurring in part and dissenting in part). The Fourteenth Amend *767 ment does not enact the dissent’s newly minted understanding of liberty. See Lochner v. New York, 198 U. S. 45, 75 (1905) (Holmes, J., dissenting) (“The Fourteenth Amendment does not enact Mr. Herbert Spencer’s Social Statics”).

 The dissent does not explain how its recognition of an interest in teaching racial understanding and cooperation here is consistent with the Court’s rejection of a similar interest in Wygant. In Wygant, a school district justified its race-based teacher-layoff program in part on the theory that “minority teachers provided ‘role models’ for minority students and that a racially ‘diverse’ faculty would improve the education of all students.” Grutter, supra, at 352 (opinion of Thomas, J.) (citing Brief for Respondents, O. T. 1985, No. 84-1340, pp. 27-28; Wygant, 476 U. S., at 315 (Stevens, J., dissenting)). The Court rejected the interests asserted to justify the layoff program as insufficiently compelling. Id., at 275-276 (plurality opinion); id., at 295 (White, J., concurring in judgment). If a school district has an interest in teaching racial understanding and cooperation, there is no logical reason why that interest should not extend to the composition of the teaching staff as well as the composition of the student body. The dissent’s reliance on this interest is, therefore, inconsistent with Wygant.

 Outside the school context, this Court’s cases reflect the fact that racial mixing does not always lead to harmony and understanding. In Johnson v. California, 543 U. S. 499 (2005), this Court considered a California prison policy that separated inmates racially. Id., at 525-528 (Thomas, J., dissenting). That policy was necessary because of “numerous incidents of racial violence.” Id., at 502 (opinion of the Court); id., at 532-534 (Thomas, J., dissenting). As a result of this Court’s insistence on strict scrutiny of that policy, but see id., at 538-547, inmates in the California prisons were killed. See Beard v. Banks, 548 U. S. 521, 536-537 (2006) (Thomas, J., concurring in judgment) (noting that two were killed and hundreds were injured in race rioting subsequent to this Court’s decision in Johnson).

 After discussing the “democratic element,” the dissent repeats its assertion that the social science evidence supporting that interest is “sufficiently strong to permit a school board to determine ... that this interest is compelling.” Post, at 841. Again, though, the school boards have no say in deciding whether an interest is compelling. Strict scrutiny of race-based government decisionmaking is more searching than Chevron-style administrative review for reasonableness. See Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 845 (1984).

 The dissent halfheartedly attacks the historical underpinnings of the colorblind Constitution. Post, at 829-830. I have no quarrel with the proposition that the Fourteenth Amendment sought to bring former slaves into American society as fall members. Post, at 829 (citing Slaughter-House Cases, 16 Wall. 36, 71-72 (1873)). What the dissent fails to understand, however, is that the colorblind Constitution does not bar the government from taking measures to remedy past state-sponsored discrimination — indeed, it requires that such measures be taken in certain circumstances. See, e. g., Part I-B, supra. Race-based government measures during the 1860’s and 1870’s to remedy state-enforced, slavery were therefore not inconsistent with the colorblind Constitution.

 See also Juris. Statement in Davis v. County School Board, O. T. 1952, No. 191, p. 8 (“[W]e take the unqualified position that the Fourteenth Amendment has totally stripped the state of power to make race and color the basis for governmental action”); Tr. of Oral Arg. in Brown v. Board of Education, O. T. 1952, No. 8, p. 7 (‘We have one fundamental contention which we will seek to develop in the course of this argument, and that contention is that no State has any authority under the equal-protection clause of the Fourteenth Amendment to use race as a factor in affording educational opportunities among its citizens”); Tr. of Oral Arg. in Briggs *773 v. Elliott et al., O. T. 1953, No. 2 etc., p. 50 (“[T]he state is deprived of any power to make any racial classifications in any governmental field”).

 See also Brief for Appellees in Davis v. County School Board, O. T. 1952, No. 191, p. 1 (“[T]he Court is asked ... to outlaw the fixed policies of the several States which are based on local social conditions well known to the respective legislatures”); id., at 9 (“For this purpose, Virginia history and present Virginia conditions are important”); Tr. of Oral Arg. in Davis v. County School Board, O. T. 1952, No. 191, p. 57 (“[T]he historical background that exists, certainly in this Virginia situation, with all the strife and the history that we have shown in this record, shows a basis, a real basis, for the classification that has been made”); id., at 69 (describing the potential abolition of segregation as “contrary to the customs, the traditions and the mores of what we might claim to be a great people, established through generations, who themselves are fiercely and irrevocably dedicated to the preservation of the white and colored races”). Accord, post, at 868 (“Today, almost 50 years later, attitudes toward race in this Nation have changed dramatically. Many parents, white and black alike, want their children to attend schools with children of different races. Indeed, the very school districts that once spumed integration now strive for it. The long history of their efforts reveals the complexities and difficulties they have faced”); post, at 822 (emphasizing the importance of “local circumstances” and encouraging different localities to “try different solutions to common problems and gravitate toward those that prove most successful or seem to them best to suit their individual needs” (internal quotation marks omitted)); post, at 848 (emphasizing the school districts’ “40-year history” during which both school districts have tried numerous approaches “to achieve more integrated schools”); post, at 863-864 (“[T]he histories of Louisville and Seattle reveal complex circumstances and a long tradition of conscientious efforts by local school boards”).

 See also Brief for Appellees in Brown v. Board of Education, O. T. 1952, No. 8, p. 29 (“ ‘It is universally held, therefore, that each state shall determine for itself, subject to the observance of the fundamental rights and liberties guaranteed by the federal Constitution, how it shall exercise the police power .... And in no field is this right of the several states more clearly recognized than in that of public education’ ” (quoting Briggs v. Elliott, 98 F. Supp. 529, 532 (EDSC 1951))); Brief for Appellees in Briggs v. Elliott, O. T. 1952, No. 101, p. 7 (“Local self-government in local affairs is essential to the peace and happiness of each locality and to the strength and stability of our whole federal system. Nowhere is this more profoundly true than in the field of education”); Tr. of Oral Arg. in Briggs v. Elliott, O. T. 1952, No. 101, pp. 54-55 (“What is the great national and federal policy on tiris matter? Is it not a fact that the very strength and fiber of our federal system is local self-government in those matters for which local action is competent? Is it not of all the activities of government the one which most nearly approaches the hearts and minds of people, the question of the education of their young? Is it not the height of wisdom that the manner in which that shall be conducted should be left to those most immediately affected by it, and that the wishes of the parents, both white and colored, should be ascertained before their children are forced into what may be an unwelcome contact?”). Accord, post, at 849 (“[L]ocal school boards better understand their own communities and have a better knowledge of what in practice will best meet the educational needs of their pupils”); post, at 866 (“[W]hat of respect for democratic local decisionmaking by States and school boards?”); ibid, (explaining “that the Constitution grants local school districts a significant degree of leeway”).

 See also Brief for Appellees in Reply to Supp. Brief for the United States on Reargument in Davis v. County School Board, O. T. 1953, No. 4, p. 17 (“The Court is . . . dealing with thousands of local school districts and schools. Is each to be the subject of litigation in the District Courts?”); Brief for Kansas on Reargument in Brown v. Board of Education, O. T. 1953, No. 1, p. 51 (“The delicate nature of the problem of segregation and the paramount interest of the State of Kansas in preserving the internal peace and tranquility of its people indicates that this is a question which can best be solved on the local level, at least until Congress declares otherwise”). Accord, post, at 861 (“At a minimum, the plurality's views would threaten a surge of race-based litigation. Hundreds of state and federal statutes and regulations use racial classifications for educational or other purposes----In many such instances, the contentious force of legal challenges to these classifications, meritorious or not, would displace earlier calm”); post, at 865 (“Indeed, the consequences of the approach the Court takes today are serious. Yesterday, the plans under review were lawful. Today, they are not”); post, at 866 (predicting “further litigation, aggravating race-related conflict”).

 See also Statement of Appellees Opposing Jurisdiction and Motion to Dismiss or Affirm in Davis v. County School Board, O. T. 1952, No. 191, p. 5 (“[I]t would be difficult to find from.any field of law a legal principle more repeatedly and conclusively decided than the one sought to be raised by appellants”); Brief for Appellees on Reargument in Davis v. County School Board, O. T. 1953, No. 4, pp. 46-47 (“If this case were to be decided solely on the basis of precedent, this brief could have been much more limited. There is ample precedent in the decisions of this Court to uphold *777 school segregation”); Brief for Petitioners in Gebhart v. Belton, O. T. 1952, No. 448, p. 27 (“Respondents ask this Court to upset a long established and well settled principle recognized by numerous state Legislatures, and Courts, both state and federal, over a long period of years”); Tr. of Oral Arg. in Briggs v. Elliott et al., O. T. 1953, No. 2 etc., at 79 (“But be that doctrine what it may, somewhere, sometime to every principle comes a moment of repose when it has been so often announced, so confidently relied upon, so long continued, that it passes the limits of judicial discretion and disturbance. ... We relied on the fact that this Court had not once but seven times, I think it is, pronounced in favor of the separate but equal doctrine. We relied on the fact that the courts of last appeal of some sixteen or eighteen States have passed upon the validity of the separate but equal doctrine vis-a-vis the Fourteenth Amendment. We relied on the fact that Congress has continuously since 1862 segregated its schools in the District of Columbia”); App. D to Brief for Appellees in Briggs v. Elliott, O. T. 1952, No. 101 (collecting citations of state and federal eases “[w]hich [ejnunciate the [principle that [s]tate [l]aws [providing for [rjacial [segregation in the [p]ublie [sjchools do not [cjonfliet with the Fourteenth Amendment”). Accord, post, at 823 (“[T]he Court set forth in Swann a basic principle of constitutional law — a principle of law that has found wide acceptance in the legal culture” (internal quotation marks omitted)); post, at 825-826 (“Lower state and federal courts had considered the matter settled and uncontroversial even before this Court decided Swann”); post, at 827 (“Numerous state and federal courts explicitly relied upon Swann’s guidance for decades to follow”); post, at 828 (stating “how lower courts understood and followed Swann’s enunciation of the relevant legal principle”); post, at 831 (“The constitutional principle enunciated in Swann, reiterated in subsequent cases, and relied upon over many years, provides, and has widely been thought to provide, authoritative legal guidance”); post, at 861 (“[T]oday’s opinion will require setting aside the laws of several States and many local communities”); post, at 866 (“And what has happened to Swann? To McDaniel? To Crawford? To Harris? To School Committee of Boston? To Seattle School Dist. No. 1? After decades of vibrant life, they would all, under the plurality’s logic, be written out of the law”).

 Compare Brief for Appellees in Davis v. County School Board, O. T. 1952, No. 191, at 16-17 (“ ‘It is by such practical considerations based on *778 experience rather than by theoretical inconsistencies that the question of equal protection is to be answered’ ” (quoting Railway Express Agency, Inc. v. New York, 336 U. S. 106, 110 (1949))); Brief for Appellees on Reargument in Davis v. County School Board, O. T. 1953, No. 4, at 76 (“The question is a practical one for them to solve; it is not subject to solution in the theoretical realm of abstract principles”); Tr. of Oral Arg. in Briggs v. Elliott et al., O. T. 1953, No. 2 etc., at 86 (“[Y]ou cannot talk about this problem just in a vacuum in the manner of a law school discussion”), with post, at 858 (“The Pounders meant the Constitution as a practical document”).

 Compare Brief for Kansas on Reargument in Brown v. Board of Education, O. T. 1953, No. 1, at 57 (“[T]he people of Kansas ... are abandoning the policy of segregation whenever local conditions and local attitudes make it feasible”); Brief for Appellees on Reargument in Davis v. County School Board, O. T. 1953, No. 4, at 76 (“As time passes, it may well be that segregation will end”), with post, at 820 (“[T]hey use race-conscious criteria in limited and gradually diminishing ways”); post, at 848 (“[E]ach plan’s use of race-conscious elements is diminished compared to the use of race in preceding integration plans”); post, at 855 (describing the “historically diminishing use of race” in the school districts).

 It is no answer to say that these cases can be distinguished from Brown because Brown involved invidious racial classifications whereas the racial classifications here are benign. See post, at 863-864. How does one tell when a racial classification is invidious? The segregationists in Brown argued that their racial classifications were benign, not invidious. See Tr. of Oral Arg. in Briggs v. Elliott et al., O. T. 1953, No. 2 etc., at 83 (“It [South Carolina] is confident of its good faith and intention to produce equality for all of its children of whatever race or color. It is convinced that the happiness, the progress and the welfare of these children is best promoted in segregated schools”); Brief for Appellees on Reargument in Davis v. County School Board, O. T. 1953, No. 4, at 82-83 (“Our many hours of research and investigation have led only to confirmation of our view that segregation by race in Virginia’s public schools at this time not only does not offend the Constitution of the United States but serves to provide a better education for living for the children of both races”); Tr. of Oral Arg. in Davis v. County School Board, O. T. 1952, No. 191, at 71 *779 (“[T]o make such a transition, would undo what we have been doing, and which we propose to continue to do for the uplift and advancement of the education of both races. It would stop this march of progress, this onward sweep”). It is the height of arrogance for Members of this Court to assert blindly that their motives are better than others.

 See also id., at 8-9 (“It has been urged that [these state laws and policies] derive validity as a consequence of a long duration supported and made possible by a long line of judicial decisions, including expressions in some of the decisions of this Court. At the same time, it is urged that these laws are valid as a matter of constitutionally permissible social experimentation by the States. On the matter of stare decisis, I submit that the duration of the challenged practice, while it is persuasive, is not controlling.... As a matter of social experimentation, the laws in question must satisfy the requirements of the Constitution. While this Court has permitted the States to legislate or otherwise officially act experimentally in the social and economic fields, it has always recognized and held that this power is subject to the limitations of the Constitution, and that the tests of the Constitution must be met”); Reply Brief for Appellants on Reargument in Briggs v. Elliott et al., O. T. 1953, No. 2 etc., pp. 18-19 *780 (“The truth of the matter is that this is an attempt to place local mores and customs above the high equalitarian principles of our Government as set forth in our Constitution and particularly the Fourteenth Amendment. This entire contention is tantamount to saying that the vindication and enjoyment of constitutional rights recognized by this Court as present and personal can be postponed whenever such postponement is claimed to be socially desirable”).

 The dissent does not face the complicated questions attending its proposed standard. For example, where does the dissent’s principle stop? Can the government force racial mixing against the will of those being mixed? Can the government force black families to relocate to white neighborhoods in the name of bringing the races together? What about historically black colleges, which have “established traditions and programs that might disproportionately appeal to one race or another”? United, States v. Fordice, 505 U. S. 717, 749 (1992) (Thomas, J., concurring). The dissent does not and cannot answer these questions because the contours of the distinction it propounds rest entirely in the eye of the beholder.

 Justice Breyer’s good intentions, which I do not doubt, have the shelf life of Justice Breyer’s tenure. Unlike the dissenters, I am unwilling to delegate my constitutional responsibilities to local school boards and allow them to experiment with race-based decisionmaking on the assumption that their intentions will forever remain as good as Justice Breyer’s. See The Federalist No. 51, p. 349 (J. Cooke ed. 1961) (“If men were angels, no government would be necessary”). Indeed, the racial theories endorsed by the Seattle School Board should cause the dissenters to question whether local school boards should be entrusted with the power to make decisions on the basis of race. The Seattle school district’s Website formerly contained the following definition of “cultural racism”: “ ‘Those aspects of society that overtly and covertly attribute value and normality to white people and whiteness, and devalue, stereotype, and label people of color as “other,” different, less than, or render them invisible. Examples of these norms include defining white skin tones as nude or flesh colored, having a future time orientation, emphasizing individualism as opposed to a more collective ideology, defining one form of English as standard ....’” See Harrell, School Web Site Removed: Examples of Racism Sparked Controversy, Seattle Post-Intelligencer, June 2, 2006, pp. Bl, B5. After the site was removed, the district offered the comforting clarification that the site was not intended “ ‘to hold onto unsuccessful concepts such as melting pot or colorblind mentality.’” Ibid.; see also ante, at 730, n. 14 (plurality opinion).
More recently, the school district sent a delegation of high school students to a “White Privilege Conference.” See Equity and Race Relations White Privilege Conference, http://www.seattleschools.org/area/ equityandrace/whiteprivilegeconference.xml. One conference participant described “white privilege” as “an invisible package of unearned assets which I can count on cashing in each day, but about which I was meant to remain oblivious. White Privilege is like an invisible weightless knapsack of special provisions, maps, passports, codebooks, visas, clothes, tools, and blank checks.” See White Privilege Conference, Questions and Answers, http://www.uccs.edu/~wpc/faqs.htm; see generally Westneat, District’s Obsessed with Race, Seattle Times, Apr. 1, 2007, p. Bl (describing racial issues in Seattle schools).